JOSÉ RAMÓN y SEGISMUNDO QUIÑONES Y QUIÑONES, demandantes y recurridos, *v.* ROSENDO QUIÑONES IRIZARRY, demandado y recurrente.

*Número:* 54 *Resuelto:* 9 de noviembre de 1964

226

*Luis A. Negrón López,* y *José Martín Betancourt,* abogados del recurrente; *Mariano Acosta Velarde,* y *Daniel Pellón Lafuente,* abogados de los recurridos.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

El Juez Asociado Señor Hernández Matos emitió la opinión del Tribunal.

Revisamos un fallo favorable rendido en un juicio de retracto de comuneros. Principales puntos en este recurso: la caducidad del derecho de los actores y la cualidad de extraño del comprador demandado.

El 15 de junio de 1954 los hermanos José Ramón y Segismundo Quiñones y Quiñones iniciaron en el Tribunal Superior, Sala de San Juan, una acción sobre retracto legal contra Rosendo Quiñones Irizarry, primo hermano de ellos. Alegaron en su demanda, en síntesis:

Que conjuntamente con sus hermanas Sara y Antonia Quiñones eran dueños, en común *pro indiviso,* de tres fincas rústicas situadas en el barrio Sábana Grande Abajo de San Germán, la primera compuesta de 66.50 cuerdas—su verdadera cabida entonces era de 49.75 cuerdas—la segunda de 8.46 cuerdas y la tercera de una cuerda; que por escritura pública otorgada el 25 del anterior mes de mayo sus hermanas Sara y Antonia "vendieron y enajenaron al demandado

Rosendo Quiñones Irizarry, el cual es un extraño a la comunidad y por precio de $2,000 para cada una de ellas, el condominio [de una dieciseisava parte] que a cada una de ellas les correspondía en las tres fincas . . .”; que consignaban $4,000 precio de la venta y estaban dispuestos a pagar los gastos de la escritura de retroventa y a subrogarse en lugar del comprador en las mismas condiciones del contrato, comprometiéndose a no vender, durante cuatro años, los condominios objeto de la acción y que “tuvieron conocimiento de la venta de los condominios . . . el día 11 del corriente mes de junio.”

Se trasladó la litis a la Sala de Mayagüez del Tribunal Superior. Allí el demandado contestó y contrademandó. Negó en su contestación que al realizarse la venta que originó la acción de retracto los cuatro hermanos José Ramón, Segismundo, Sara y Antonia fueran los únicos dueños en común *pro indiviso* de las tres fincas descritas en la demanda; en contrario alegó que en la fecha de radicación de la demanda eran, y continuaban siendo, dueños en común *pro indiviso* de esas tres fincas “y de todas las demás que se describirán más adelante” las personas siguientes: los dos hermanos demandantes y sus dos hermanas vendedoras, Sara y Antonia, en unión al demandado y todos los demás “herederos voluntarios” de sus tíos paternos Mariano y María de los Dolores Quiñones Guzmán; admitió la celebración de la compraventa; negó que era un extraño en la comunidad y expuso que “es uno de los miembros de la comunidad”, razón por la cual “los condominios objeto de esta acción de retracto fueron enajenados a un condómine, no procediendo contra éste la acción de retracto ni la subrogación que pretenden los demandantes.” Respecto a la fecha en que los demandantes alegaron tener conocimiento de la venta, expuso: “. . . los demandantes tuvieron conocimiento de la compraventa . . . desde antes de formalizarse la misma, durante las negociaciones de dicha compraventa, desde la misma fecha en que se otorgó la

escritura #7 de fecha 25 de mayo de 1954 . . . y desde antes de esa fecha, y que rehusaron adquirir u obtener o comprar los condominios . . . y renunciaron a comprar esos condominios . . . por consiguiente a la acción de retracto que pretenden ejercitar."

Como defensas adujo: (1) la prescripción de la acción de retracto legal con arreglo al Art. 1414 del Código Civil; (2) la renuncia expresa de su ejercicio por los demandantes, y (3) que la escritura pública sobre división de comunidad otorgada el 21 de enero de 1944—diez años antes—ante el notario Oscar Souffront, por la cual se había separado de la comunidad de bienes que para entonces existía sobre esas tres fincas entre él y sus cuatro primos los hermanos Quiñones y Quiñones, recibiendo él una parcela de 16.75 cuerdas, segregada de la finca de 66.50, en pago definitivo y completo de su participación o cuota en todos los bienes de la comunidad, era nula, ineficaz y carecía de valor legal debido a que: (a) José Ramón Quiñones compareció en dicha escritura como mandatario de su tía mencionada María de los Dolores Quiñones y Guzmán y de los miembros de la sucesión de su padre Tomás Quiñones Guzmán, compuesta de su viuda Antonia Quiñones y de sus cuatro hijos José Ramón, Segismundo, Sara y Antonia Quiñones y Quiñones, sin estar legalmente autorizado para ello, por lo que no le traspasó un título legalmente válido e inscribible en el Registro de la Propiedad sobre dicha parcela de 16.75 cuerdas; (b) "falsamente y a sabiendas", ocultando la verdadera cabida de las fincas, se le habían adjudicado 16.75 cuerdas cuando le correspondían en derecho 18.74 cuerdas; (c) era nulo, ineficaz, inexistente y sin valor legal el título por el cual .José Ramón Quiñones alegaba ser dueño de las participaciones que en esas fincas habían correspondido a su tía María de los Dolores Quiñones Guzmán; (d) en la hipótesis de ser válido ese título, su mencionada tía no podía haberle trasmitido la mitad sobre esas fincas en las que ella realmente tenía una

cuarta parte, porque la otra cuarta parte que ella alegaba tener como única sucesora de su hermano Mariano, jamás la había heredado por ser nulo el testamento de éste y (e) porque en el supuesto de haberla adquirido válidamente por esa herencia, María de los Dolores Quiñones Guzmán no había satisfecho la correspondiente contribución de herencia, otorgándose, por lo tanto, la división de comunidad de 1944 en violación a las disposiciones de la Ley de Contribución sobre Herencia.

La contrademanda contiene dos causas de acción. Por la primera se interesa la declaración de nulidad (1) del testamento abierto otorgado el 21 de febrero de 1919 por el tío Mariano Quiñones Guzmán, fallecido el 31 de mayo de 1922—es decir, 33 años antes, ya que la contrademanda se interpuso el 23 de marzo de 1955—en el que instituye a su hermana María de los Dolores Quiñones Guzmán única y universal heredera suya, y (2) la nulidad de las escrituras de venta y aceptación de venta, otorgadas, respectivamente, por dicha tía ante un agente consular en Barcelona, España, el 3 de setiembre de 1941, y por José Ramón Quiñones en Mayagüez, el 20 de octubre siguiente, ante el notario Oscar Souffront—ambas con anterioridad de más de 13 años—por las que ella vendió y éste compró la totalidad de otras once fincas rústicas y la mitad indivisa y el usufructo sobre la otra mitad, que ella tenía sobre los tres predios objeto del retracto, habiendo adquirido la trasmitente un cincuenta por ciento de esos bienes en virtud del referido testamento abierto de su hermano Mariano Quiñones Guzmán. Se solicitaba, para el caso de prosperar tales nulidades, se ordenara la distribución de los bienes de ambos tíos causantes, con sus frutos, entre los ocho sobrinos de ambos nombrados en la contrademanda.

Por la segunda causa de acción el contrademandante alegó que el mismo corretrayente José Ramón Quiñones Quiñones, en el año 1944, le privó "de una participación en fincas labrantías" que equivalía "a una extensión de terreno

no menos de dos (2) cuerdas", por lo que pedía se le condenara al pago de los frutos debidos producir por esa participación valorados en $4,000.00.

Replicaron los demandantes a las defensas afirmativas de la contestación y a la contrademanda y adujeron "materia nueva de defensa especial a las defensas de hecho y de derecho alegadas en la contestación." Contra las pretensiones del demandado contrademandante alegaron las defensas de impedimento, prescripción extintiva de acciones y adquisitiva de dominio. Negaron los hechos esenciales expuestos en la contrademanda y alegaron que todas las transacciones, actos y contratos impugnados por la misma eran válidos y eficaces en derecho.

Entre el 5 de marzo de 1958 y el 9 de mayo siguiente fue celebrado el juicio tomándose seis días de vista. La evidencia documental y testifical practicada es copiosa. Tres voluminosas piezas constituyen el récord taquigráfico. Se elevaron unos 60 documentos admitidos y varios más no admitidos.

El 25 de setiembre de 1958 se dictó sentencia final declarando con lugar la acción de retracto y desestimando la contrademanda, con costas pero sin imposición de honorarios de abogado. No solicitó reconsideración el demandado ni presentó moción alguna bajo la Regla 43.2 interesando enmiendas a las determinaciones del Tribunal o que éste hiciera nuevas determinaciones. Por la importancia que tienen en este recurso transcribimos a continuación todas las determinaciones sobre los hechos, rendidas por el tribunal de instancia:

"1. El día 25 de mayo de 1954, mediante la escritura Núm. 7 otorgada ante el notario Salvador Suau Carbonell, Doña Sara Quiñones vda. de Domínguez y Doña Antonia vda. de Sotográs, hermanas de los demandantes, vendieron al demandado Rosendo Quiñones Irizarry la participación proindivisa de la cuarta parte de una cuarta parte que cada una de estas vendedoras tenía en las fincas de 66.50 cuerdas, de 8.46 cuerdas y de una cuerda

sitas en el Bo. Sábana Grande Abajo de San Germán, que se describen en el párrafo 1ro. de la demanda, siendo el precio de venta el de $2,000.00 por cada condominio. La venta no fue inscrita en el Registro de la Propiedad.

"2. Aunque los demandantes tenían conocimiento desde pocos días antes de otorgarse esta escritura de que sus dos hermanas interesaban vender su participación en estas fincas y que. el demandado Rosendo Quiñones tenía interés en comprar, ya que sus hermanas les habían indicado su intención de vender, requiriéndoles para que les informasen si interesaban comprar, cuando se formalizó la venta los demandantes no le habían manifestado a sus hermanas en forma clara y definitiva que ellos no tuviesen interés en adquirir sus condominios y que estuviesen conformes con que ellas le vendiesen al demandado. Cuando los demandantes estaban considerando si interesaban o no comprar los condominios de sus hermanas el demandante José Ramón Quiñones tuvo que ausentarse para los Estados Unidos, y cuando éste regresó ya se había consumado la venta a favor del demandado. José Ramón Quiñones salió de Puerto Rico el 23 de mayo de 1954, o sea dos días antes de consumarse la venta, regresando éste a Puerto Rico el 3 de junio de 1954.

"3. Siete días después de regresar a Puerto Rico, o sea el 10 de junio de 1954, se enteraron los demandantes por primera vez por una comunicación telefónica recibida por el demandante José Ramón Quiñones del Lcdo. Oscar Souffront de que la venta de los condominios de sus hermanas al demandado se había formalizado el 25 de mayo de 1954. Al día siguiente el demandante José Ramón Quiñones visitó la oficina del Lcdo. Salvador Suau Carbonell, que era el notario que había autorizado la venta de los condominios de sus hermanas, enterándose éste entonces de los detalles de la transacción efectuada.

"4. Al enterarse los demandantes de que los condominios de sus hermanas se habían vendido al demandado por el precio de $2,000.00 cada uno, consideraron los demandantes que el precio era bajo y que les convenía en esas condiciones readquirir esas participaciones proindivisas de sus hermanas, procediendo entonces los demandantes inmediatamente a hacer las gestiones necesarias con sus abogados para radicar la correspondiente acción de retracto, la cual fue radicada ante el Tribunal Superior de San Juan el 15 de junio de 1954.

"5. Contigua a estas tres fincas el demandante José Ramón Quiñones venía explotando a título de dueño desde el año 1941 varias fincas con una cabida total de alrededor de 200 cuerdas de terreno, siendo dichas fincas las que se describen en las páginas 12, 13 y 14 de la contrademanda, cuyas fincas había adquirido el demandante por compra a su tía Doña Francisca Quiñones Guzmán en el año 1941. La transacción de venta se formalizó mediante un documento otorgado por Doña Francisca Quiñones Guzmán en la ciudad de Barcelona ante el Vice-Cónsul de los Estados Unidos en dicha ciudad el 3 de septiembre de 1941 que fue luego ratificado y aceptado por el demandante José Ramón Quiñones mediante la escritura $145 otorgada ante el Lcdo. Oscar Souffront en Puerto Rico el 20 de octubre de 1941.

"6. En el documento otorgado por Doña Francisca Quiñones Guzmán en la ciudad de Barcelona en el año 1941 la propia otorgante valoró estas fincas que vendía al demandante José Ramón Quiñones en $56,200.00 haciendo ésta constar además en el documento en cuanto al precio de venta lo siguiente:

"TERCERO: Que ha convenido vender y por la presente vende a su sobrino Don José Ramón Quiñones y Quiñones, mayor de edad, soltero, Presidente de la Comisión de Servicio Público de Puerto Rico, y vecino de San Juan, Isla de Puerto Rico, Estados Unidos de América, cuantos derechos y acciones le correspondan en las fincas arriba descritas, traspasándole desde hoy, todo título e interés que la vendedora tiene en las mismas; en consideración a que el señor Quiñones ha de obligarse a entregar a la otorgante una renta de cuatrocientos dólares (moneda de los Estados Unidos de América) mensuales durante la vida de ésta.

"CUARTO: El señor Quiñones se obliga a aceptar este contrato en el término de seis meses a contar de hoy, retrotrayéndose los efectos de dicha aceptación a los del presente otorgamiento. Siendo condición de este contrato que todas y cada una de las fincas descritas quedan sujetas a la obligación de renta vitalicia durante la vida de la señorita Quiñones.

"7. El documento fue debidamente firmado por doña Francisca Quiñones Guzmán, siendo el mismo luego autenticado por el Vice-Cónsul de los Estados Unidos de América en Barcelona dando fe del conocimiento personal de la otorgante. Y en armonía con lo manifestado en dicho documento por doña Fran-

cisca Quiñones Guzmán y el término de seis meses estipulado para la aceptación del mismo, el 20 de octubre de 1941, compareció el demandante José Ramón Quiñones ante el Lcdo. Oscar Souffront aquí en Puerto Rico y otorgó la escritura Núm. 145 en la cual se transcribió el documento antes mencionado, haciéndose constar a renglón seguido que el demandante José Ramón Quiñones aceptaba en todas sus partes el documento antes indicado, obligándose éste a entregar a la vendedora una renta de $400.00 durante la vida de ésta, a contar del día en que se otorgó por doña Francisca Quiñones Guzmán el documento ante el Vice-Cónsul en Barcelona.

"8. Entre las fincas vendidas por doña Francisca Quiñones Guzmán mediante esta transacción al demandante José Ramón Quiñones figuraba la participación que tenía doña Francisca Quiñones Guzmán en las tres fincas objeto de la acción de retracto de los demandantes, en las cuales tenía Doña Paca una participación de una mitad en pleno dominio y el usufructo sobre las otras dos cuartas partes, que pertenecían en nuda propiedad una cuarta parte a los demandantes y sus dos hermanas, y la otra cuarta parte al demandado Rosendo Quiñones Irizarry (véase exhibit C del demandado).

"9. Todas estas fincas habían estado arrendadas a la Central Guánica desde el año 1919 hasta el año 1936, siendo luego arrendadas desde ese año hasta el 1941 a Don Alfredo Ramírez de Arellano por un canon de arrendamiento de $30.00 anuales por cuerda, haciéndose cargo el arrendatario del pago de las contribuciones. Durante todos estos años en que estas fincas estuvieron arrendadas, el demandado Rosendo Quiñones Irizarry, quien sólo tenía la nuda propiedad de una cuarta parte de las tres fincas objeto de la acción de retracto, siempre recibió su parte proporcional del precio del arrendamiento, sin haber nunca reclamado el demandado una mayor participación en el producto del arrendamiento, recibiendo el resto del canon la tía de los demandantes, Doña Francisca Quiñones de Guzmán, habiendo reconocido siempre el demandado el derecho de dominio y el usufructo que tenía Doña Francisca sobre estas fincas. (Véase exhibit C.) Cuando las fincas estaban arrendadas a la Central Guánica el demandado recibía $303.00 anuales del canon de arrendamiento, y mientras estuvieron arrendadas a Ramírez de Arellano recibía éste $487.00 anuales, y todo ello a pesar de que él sólo tenía la nuda propiedad de la cuarta

parte de las tres fincas objeto de la acción de retracto. (Véase exhibit C.)

"10. Después de haber adquirido el demandante José Ramón Quiñones por compra las fincas y las participaciones de su tía Francisca Quiñones de Guzmán en el año 1941, el demandado comenzó a exigirle al demandante que le liquidase la participación que él tenía en estas tres fincas, en las cuales había adquirido el demandante el pleno dominio de una mitad, el usufructo de la cuarta parte que pertenecía a él y a sus hermanos en nuda propiedad, y el usufructo sobre el condominio de una cuarta parte que pertenecía al demandado Rosendo Quiñones en nuda propiedad. (Véase exhibit GG.)[1] A tal fin, el 21 de enero de 1944 se otorgó ante el Lcdo. Oscar Souffront la escritura Núm. 6, sobre división de comunidad (Ex. 1), adjudicándosele al demandado en pago de su participación indivisa en estas tres fincas una porción de terreno de 16.75 céntimos que fue valorada por los otorgantes en $3,350.00, o sea, alrededor de $200.00 la cuerda, quedando reducido el condominio del demandante y sus hermanos a una cabida de 59 cuerdas con 31 céntimos. En esa escritura, aun cuando hasta ese momento el demandado Rosendo Quiñones no tenía título alguno sobre el usufructo de su condominio, los otorgantes reconocieron que el demandado tenía el pleno dominio de la cuarta parte de esas fincas.

"11. En la escritura de división de comunidad antes mencionada compareció el demandado por su propio derecho y el demandante José Ramón Quiñones como mandatario de la sucesión de don Tomás Quiñones y Guzmán compuesta por su viuda doña Antonia Quiñones vda. de Quiñones y sus hijos Doña Sara Quiñones vda. de Domínguez, doña Antonia Quiñones vda. de Sotográs, Don Segismundo Quiñones y el compareciente José Ramón Quiñones Quiñones, haciéndose constar en la escritura por los comparecientes que José Ramón Quiñones era dueño de la mitad de las tres fincas, que son las mismas tres fincas objeto de la acción de retracto envueltas en este caso, por haber adquirido las mismas mediante la escritura otorgada por doña Francisca Quiñones Guzmán ante el Vice-Cónsul de los

---

"[1]A pesar de ello, el demandante continuó reconociéndole al demandado el derecho a participar en los beneficios de estas fincas como si éste tuviese el pleno dominio de su cuarta parte."

Estados Unidos en la ciudad de Barcelona el día 3 de septiembre de 1941, y cuya escritura fue debidamente ratificada mediante la escritura Núm. 145 otorgada en Mayagüez el 20 de octubre de ese mismo año.

"12. El demandante José Ramón Quiñones compareció en la escritura como mandatario de su madre y de sus hermanos por tener éste poder de su madre Doña Antonia Quiñones vda. de Quiñones (exhibit 18 y 4), de su hermana Antonia Quiñones vda. de Sotográs (exhibit 21) y de su hermano Segismundo Quiñones (exhibit 5) para vender o enajenar los bienes inmuebles de éstos, teniendo además el demandante mandato verbal de su hermana Sara para llevar a cabo la transacción. En el documento se hizo constar además que la mitad indivisa que había adquirido el demandante José Ramón Quiñones de su tía Doña Francisca Quiñones Guzmán en el 1941 estaba sujeta al derecho de 'usufructo' constituido a favor de Doña Francisca Quiñones Guzmán en los documentos en que se formalizó la transacción entre dicho demandante y su tía, haciéndose constar además, luego de adjudicársele al demandado la porción de 16.75 céntimos que le correspondió en pago de su participación de una cuarta parte en estas fincas, que el resto de las fincas, que quedaban con una cabida de 59.31 cuerdas, pertenecían en pleno dominio, una tercera parte a doña Antonia Quiñones vda. de Quiñones y sus hijos Sara, Antonia, Segismundo y José Ramón, y dos terceras partes al demandante José Ramón Quiñones, quedando esas dos terceras partes sujetas al usufructo mencionado en el documento a favor de doña Francisca Quiñones Guzmán.

"13. Doña Francisca Quiñones Guzmán murió el día 12 de enero de 1954, a los 93 años de edad. Doña Paca vivió la mayor parte de su vida de rentas en Europa, primero de las rentas que le producía el arrendamiento de sus fincas a la Central Guánica y a Ramírez de Arellano, y luego de la renta vitalicia de $400.00 mensuales mediante la cual doña Paca convino en venderle las fincas objeto de la contrademanda a su sobrino José Ramón Quiñones, quien era su sobrino predilecto y la persona que desde que doña Paca adquirió estas fincas por herencia de su hermano Mariano Quiñones en el año 1922 se había encargado de administrar las mismas para su tía, habiendo ésta otorgado poder a su sobrino desde entonces para administrar esas fincas (véase exhibit 2). Al venderle doña Paca

al demandante José Ramón Quiñones estas fincas en el año 1941, la propia doña Paca hizo constar en el documento otorgado en Barcelona ante el Vice-Cónsul de los Estados Unidos que valoraba las fincas, una a una, en un valor total de $56,200.00. Doña Paca vivió, luego de vender sus propiedades al demandante, hasta enero de 1954, habiendo ésta recibido del demandante en virtud de la renta vitalicia convenida como precio de venta de estas fincas una suma total de alrededor de $60,000.00.

"14. Las fincas vendidas por doña Francisca Quiñones vda. de Guzmán a su sobrino José Ramón Quiñones aparecían en escritura con una cabida total de 219.50 cuerdas. De esas 17 cuerdas eran un monte sin valor agrícola alguno, y una proporción de alrededor de 18 cuerdas era disfrutada como propia por el demandado, restando al demandante José Ramón Quiñones en pleno dominio y usufructo 184.50 cuerdas cultivables, que a base del precio fijado por la vendedora, salían a poco más de $300.00 la cuerda, no resultando ese precio exiguo o irrazonable, ya que en el 1944 y 1945 el Gobierno de Puerto Rico valoró terrenos de caña contiguos a estas fincas que eran propiedad de la Central Guánica y habían sido expropiados en el año 1943 a razón de $326.00 la cuerda, debiendo tenerse presente que ya para el 1943 la segunda guerra mundial estaba en pleno apogeo y las fincas de caña que en los primeros años de la guerra habían sufrido el inconveniente de la escasez de abono y las restricciones de cuotas ya habían comenzado a subir de valor al eliminarse las restricciones azucareras y comenzar a subir el precio del azúcar. Además, el propio demandado había valorado la porción de 16.75 cuerdas que le fue adjudicada a él en el año 1944 mediante la escritura de división de comunidad en un precio de $3,350.00, que era un precio por unidad de alrededor de $200.00 la cuerda, y esa parcela adjudicada al demandado no incluía la parte de cerro de las fincas que no tenían casi ningún valor agrícola, la cual le correspondió al demandante y sus hermanos.

"15. Es cierto que hasta poco antes de que Doña Francisca le vendiese esas fincas al demandante éstas habían estado arrendadas a don Alfredo Ramírez de Arellano a razón de $30.00 la cuerda cultivable de caña recibiendo doña Francisca como mil dólares anuales más por dicho arrendamiento que los $4,800.00 que iba a recibir de su sobrino José Ramón como renta vitalicia por su parte de alrededor de 184.50 cuerdas, pero debe tenerse

presente que el término de ese arrendamiento ya había cesado y no había certeza alguna de que se pudiese volver a conseguir otro arrendamiento tan ventajoso como ése, (²) siendo el criterio del propio demandado que no era aconsejable el volver a arrendar las fincas, ya que se corría el riesgo de perder parte de la cuota (véase exhibit 24), confrontándose en esa forma Doña Francisca con la alternativa de tener que explotar sus fincas, con la incertidumbre de un mercado inestable y de serias restricciones en las cuotas de abono (véase carta del demandado de mayo 31 de 1942—Ex. 25).

"16. Desde que se le adjudicó al demandado la parcela de 16.75 cuerdas en el año 1944 mediante la escritura de división de comunidad antes mencionada, el demandado ha venido explotando esa finca para su exclusivo beneficio, amparándose en la escritura de división de comunidad para hacer valer sus derechos dominicales sobre esa parcela, no habiendo el demandado impugnado o cuestionado en momento alguno la capacidad del demandante José Ramón Quiñones para haber comparecido en esa escritura a nombre propio y de sus hermanos para adjudicarle esos terrenos al demandado, habiéndose considerado el propio demandado durante todos estos años como un extraño a la comunidad en que permanecieron los demandantes y sus hermanas en cuanto a las restantes 59.31 cuerdas de esas fincas, siendo esa, además, la realidad establecida por la prueba. Antes de adjudicársele esa parcela de 16.75 al demandado las fincas objeto de la acción de retracto fueron medidas, saliendo con una cabida de 74.93 cuerdas, incluyendo varias cuerdas de monte, habiendo estado el demandado conforme con que se le adjudicase en pago de su condominio de una cuarta parte esas 16.75 cuerdas de terreno totalmente llano, el cual resultaba proporcionalmente con más frente a la carretera que el resto de las fincas."

A solicitud del demandado decidimos revisar el fallo. Ante nos sostiene que esas dieciséis Conclusiones de Hecho "no podían estar justificadas en forma alguna con arreglo a la prueba practicada", y que se cometieron graves errores

---

"(²) Cuando se había arrendado la finca a Ramírez de Arellano la mayoría de los interesados en arrendar sólo ofrecían $25.00 por cuerda (véase Ex. 37), y ello sólo le hubiese producido a Doña Paca por sus 184.50 cuerdas alrededor de $4,000.00."

al apreciar la prueba, "cuya naturaleza invalida la aplicación de preceptos jurídicos que son básicos y definitivos en la determinación de los derechos de la parte recurrente." Propone que en el lugar de ellas adoptemos una serie de dieciséis conclusiones que denomina "Conclusiones de Hecho Omitidas" que, a su juicio, son las que debieron haberse formulado.

Respecto a las conclusiones de derecho afirma que tanto las relativas a la acción de retracto como las relacionadas con las dos causas de acción de la contrademanda, constituyen "errores en la aplicación de la ley a los hechos de este caso."

Su alegato, extenso y muy hábilmente elaborado, no sigue la forma clásica del señalamiento de errores. Su orden de exposición y argumentación es el siguiente: Primeramente relata el hecho principal determinado en cada conclusión de hecho o su alcance y significado. Luego argumenta o discute las razones por las cuales la estima errónea. Después sugiere la conclusión de hecho que a su juicio debió haberse formulado por el tribunal sentenciador y expone los motivos que así lo justificaba. En cuanto a las de derecho, discute su improcedencia, pero no propone adoptemos otras en su lugar.

I

Entremos a considerar las impugnaciones a las conclusiones de hecho y a determinar si las mismas "no podían estar justificadas en forma alguna con arreglo a la prueba practicada." Ésta es la tesis fundamental del recurrente.

Sobre las conclusiones de hecho núms. 1, 2 y 3, el recurrente plantea así su impugnación:

"Conclusión de hecho errónea número 1.

"El Tribunal sentenciador concluyó erróneamente como hechos probados (conclusiones de hecho 1 y 2, página 2 de la sentencia), que cuando se formalizó la venta de los condominios objeto del retracto los recurridos no habían manifestado a las vendedoras en forma clara y definitiva que ellos no tuviesen

interés en adquirir tales condominios y que estuviesen confor-
mes con que ellas le vendieran al recurrente, y que cuando los
recurridos estaban considerando si interesaban o no comprar,
José Ramón Quiñones tuvo que ausentarse de Puerto Rico;
cuando lo correcto según la prueba es que el recurrido Segis-
mundo Quiñones personalmente y el recurrido José Ramón
Quiñones por conducto de su abogado Lic. Oscar Souffront,
manifestaron su decisión de no comprar los condominios objeto
del retracto y consintieron en la venta al recurrente. Estos ex-
tremos quedaron establecidos por prueba testifical y con prueba
documental no controvertida.

"Conclusión de hecho errónea número 2.

"Concluyó erróneamente como hechos probados (conclusión
de hecho 3, página 3 de la sentencia) que los recurridos se
enteraron de la venta de condominios por primera vez el día
10 de junio de 1954, cuando lo cierto es que se enteraron de la
misma antes de otorgarse la escritura de compraventa, y que
fueron notificados del otorgamiento de dicha escritura el día
26 de mayo de 1954, o sea más de nueve días antes de la radica-
ción de la demanda de retracto."

La evidencia, en forma resumida, sobre los hechos deter-
minados[1] por esas tres primeras conclusiones, es la
siguiente:

---

[1] Debemos advertir preliminarmente que la causa que genera a
mediados del año 1954 los hechos que culminan en el otorgamiento de la
escritura de venta de los condominios, la constituye dos cartas de Rosendo
Quiñones Irizarry a Antonia y Sara Quiñones, fechadas el 13 de abril
de 1954 (Exhibit AA, demandado), proponiéndoles, en iguales términos,
la compra de los condominios, y siendo el texto de una de ellas el
siguiente:

"Apartado 321,
Mayagüez, Puerto Rico
13 de abril de 1954.

"Querida prima Toñita:

"Me tomé la libertad de escribirle a Sara a tu dirección por la razón
de que la carta que le escribo a ella tiene el mismo propósito de ésta que
te escribo a ti. Deseo ustedes discutan el asunto que a ella le expliqué
personalmente con todos los detalles. Sara te indicará la falta que me
haría comprar los condominios que ustedes tienen en los terrenos del Coto
de la Sucesión Quiñones Guzmán esa finca con cabidas de 66.50 cuerdas,
8.46 cuerdas y 1 cuerda.

*De la parte demandante*: El letrado Oscar Souffront, primer testigo de la parte demandante, declaró en el examen directo que conocía a José Ramón y Segismundo Quiñones y Quiñones y a Rosendo Quiñones Irizarry desde hacía muchos años; que en la mañana del día 10 de junio de 1954, en el balcón de su oficina o dentro de su oficina situada en Mayagüez, el recurrente Rosendo le manifestó que había adquirido por compra a Sara y Antonia Quiñones los condominios objeto del retracto; que inmediatamente llamó por teléfono a José Ramón Quiñones que estaba en San Juan para informarle de esa conversación.

Identificó este testigo un Estado de Llamadas a Larga Distancia de la Porto Rico Telephone Company (Exhibit 6, demandante), del que aparece una llamada hecha por él a "J. Quiñones"—de San Juan, el 10 de junio de 1954.

En la repregunta manifestó el Lic. Souffront que había tenido relaciones profesionales esporádicas con José Ramón Quiñones, debido a una antigua e íntima amistad entre ellos y al hecho de ellos ser compadres, habiéndose tratado ellos

---

"Seguramente tú ignorarás poseer estos condominios pero Sara te explicará según yo la ilustré a ella, sobre el particular. Mi finca es tan pequeña que los condominios de ustedes unidos a mis tierras resolverían mi problema. Por esta razón te hago la oferta que consideres muy justo, ya que tú seguramente no pensarás trabajar nunca tan pequeña porción de tierra.

"De estos terrenos que arriba te indico la Sucn. de Tomás Quiñones tiene una cuarta parte proindiviso que suman, según Registro de la Propiedad de San Germán a 18.99 cuerdas. De estas 18.99 cuerdas tú tienes en proindiviso la cuarta parte que serían como 4.75 cuerdas. En estas 4.75 cuerdas te corresponde parte en terreno llano y una parte en terreno alto o cerro. Por el deseo de poder tener yo más tierras para unirlo a mi pequeña finca estoy dispuesto a pagarte $2000. cash por tus condominios haciéndome cargo de pagar las escrituras que se otorguen y luego pagar los gastos de deslinde, división de comunidad, etc.

"Espero que consideres y aceptes la oferta que arriba te propongo. Mucho te agradeceré me contestes a la mayor brevedad posible sobre el particular.

"Con mis deseos sinceros de bienestar y salud y con los saludos de Angelita, se despide tu primo que te quiere, (firmado) Rosendo."

siempre como hermanos; que también había tenido relaciones profesionales con Rosendo Quiñones Irizarry; llamó ese día 10 de junio por teléfono a José Ramón Quiñones "para darle esa información porque entendía que en la forma que le explicó Rosendo era que él quería que él notificara a Mon [nombre familiar de José Ramón Quiñones] que él había adquirido esos condominios"; que para esa época él lo representaba en unión al Lic. Ortiz Alibrán en un asunto de contribuciones sobre ingresos y también en los asuntos de la herencia de doña María de los Dolores Quiñones Guzmán en unión al Lic. Mariano Acosta Velarde, y había autorizado, como notario, muchas escrituras otorgadas por él; que el recurrente Rosendo Quiñones Irizarry, con anterioridad a la conversación que tuvo con él en la mañana del 10 de junio, le había dicho que pensaba comprar las participaciones a las hermanas Sara y Antonia; que también Sara le había dicho que pensaba vender su condominio porque necesitaba dinero, sin especificarle a quién pensaba venderlo; manifestó que de estas conversaciones no le había informado a José Ramón Quiñones, pero después declaró que no podía afirmar o negar que hubiera hablado con él sobre esas conversaciones. Al mostrarle el abogado del recurrente una carta escrita por él el 19 de mayo de 1954 a doña Sara Quiñones vda. de Domínguez[2] (Exhíbit B, demandado), dijo que antes de la fecha de esa carta Sara le había ido a ver sobre varios asuntos, posiblemente estando él visitando el Hospital Presbiteriano de San Juan donde había tenido recluida a su esposa; que después de esta entrevista con Sara, se comunicó con José Ramón Quiñones sobre varias peticiones de su hermana Sara

---

[2] Esta carta, en lo pertinente, dice así:

"Tan pronto salí de la entrevista con usted, me comuniqué con Mon y lo encontré en la mejor disposición de ayudarla. Al efecto me dijo que ya había hablado con Segismundo para que éste resolviera si quería hacer uso del derecho de retracto de comunero y adquirir él los condominios y que si no le contestara a usted inmediatamente dándole la autorización de él y de Mon para vender el condominio a Rosendo."

entre ellas la de que deseaba que se le facilitara un dinero por su señora madre y quería que su hermano José Ramón interviniera en el asunto; que éste le había dicho lo que él le había informado a Sara Quiñones en su carta del 19 de mayo de 1954, cuyo primer párrafo se inserta en el escolio 2; que José Ramón Quiñones no le expresó que ni él ni Segismundo no iban a comprar los condominios; que tal disposición negativa no se desprendía de esa carta; que la actitud de José Ramón Quiñones respecto a la compra de los condominios de sus dos hermanas era en el sentido de que si su hermano Segismundo no estaba dispuesto a ejercitar su derecho de retracto si se vendían a Rosendo él tampoco lo estaría; que había refrescado su memoria con la factura del teléfono, con la información que le habían dado en el teléfono y con otros datos que le había suministrado José Ramón Quiñones; que él no recordaba que Sara Quiñones le hubiera hablado sobre el precio de venta que le ofrecía Rosendo por los condominios y que nunca había hablado con Segismundo de esas cuestiones.

Al interrogársele si podía "recordar si antes del 31 de mayo tuvo conocimiento del otorgamiento de la escritura de Sara y Antonia a favor de Rosendo" contestó "creo que no, que no tenía conocimiento", y que podía deducir que no lo tenía por la naturaleza de la conversación que tuvo por teléfono con José Ramón Quiñones, declarando sobre este punto lo siguiente:

"Con Mon, porque, si no, se lo hubiera dicho, 'Mira, hace tiempo que estuvo aquí Rosendo y me dijo tal cosa', pero la primera impresión que yo tuve. . . . No se sabía cuál era la actitud de las partes en relación con el asunto ni podía prejuzgar que hubiera un pleito de retracto. Si yo hubiera conocido cuál era la actitud definitiva de Segismundo o de Mon con relación a si tomaban el retracto hubiera estado sobre aviso. El propio Rosendo puede saber por las palabras que habló conmigo y la impresión mía si yo tenía conocimiento de si iba a hacer uso de algún retracto. Yo tenía que saber cuál era el interés de Rosendo en que Mon lo supiera. Como eran familiares

que iban a poseer en común indiviso lo natural era que el otro condueño supiera eso."

Como segundo testigo declaró Segismundo Quiñones. Examinado por su letrado manifestó, entre otras cosas, que en su propia casa, de noche y a mediados de 1954, conversó con su hermana Antonia y ésta entonces le dijo "que Rosendo Quiñones, el primo, estaba interesado en comprar los condominios que habían en esa finca a favor de ella y de mi hermana Sara"; que no recordaba si ella le había dicho el precio y condiciones de compra; que le había hablado de los deseos que Rosendo tenía de comprarlos; que entonces informó a su hermana que "en aquel momento yo no tenía interés en adquirir, en comprar las participaciones, pero que hablaría con mi hermano"; que con motivo de los negocios de ambos pocas veces se veían él y su hemano José Ramón, y que, sin embargo, "un día me encontré con él y le dije "Mira, Mon, me ha dicho Antonia (mi hermana) que Rosendo está interesado en comprar esos condominios.' Me dice, 'Sí, me había dicho algo. Me había escrito una carta, pero eso tenemos que hablarlo. Un día de éstos vamos a hablar sobre el asunto'; que luego su hermano tuvo que salir para los Estados Unidos; después de regresar su hermano José Ramón, éste fue a verlo y le preguntó: "¿Tú sabes que tus hermanas vendieron a Chendo?"—Éste es el nombre familiar del recurrente, y "Segis" es el del testigo—que a esa pregunta él contestó: "Yo no sé nada"; entonces su hermano le dijo: "Acabo de saberlo porque Souffront me llamó por teléfono"; que luego le interrogó a su hermano José Ramón: "¿Qué vamos a hacer?" y que éste le contestó: "Yo creo que esas tierras deben quedar en poder nuestro"; que después su hermano le dijo que "iba a ir donde el Lic. Suau, para buscar una escritura"; que eso fue en el mes de junio; que le dijo a su hermano que estaba conforme "que esas tierras volvieran a nuestras manos . . . le pedí que compráramos entre los dos los condominios esos" y se hizo la demanda para readquirir

esos condominios; que su hermana Antonia, después de la primera conversación que tuvo con ella, le preguntó "qué habíamos decidido" y que contestó a ella que "Mon andaba por los Estados Unidos, que cuando viniera podíamos contestar una cosa definitiva."

Con ligeras variaciones, en el examen que le hizo el letrado del demandado, dio idénticas contestaciones, insistiendo en que: "Después que mi hermana habló conmigo yo hablé con él—con José Ramón—y entonces me dice: 'Esto vamos a estudiarlo. Vamos a ver si nos reunimos a hablar sobre esto un poquito más tarde.'" "No sé por qué no continuamos en aquel momento la conversación. Después se fue para Estados Unidos." . . . "y no tuve oportunidad de volver a hablar con él" . . . "La segunda vez que hablé con él cuando él me dijo que Souffront lo había llamado que fue cuando discutimos el asunto. Me dijo 'Yo voy a presentar un retracto legal. Una demanda.'" Sobre sus conversaciones con su hermana Antonia manifestó que nunca le había manifestado a ella que ni él ni su hermano José Ramón no deseaban comprar, ni tampoco que su decisión era no comprar los condominios, volviendo a decir:

"La primera vez que ella habló conmigo, yo le dije que yo no estaba interesado. También, que como eran dos cuerdas, que yo no estaba interesado en comprar, pero que hablaría con mi hermano. Lo hice así. Como él es el que está en la finca y el que está allá metido y es un asunto que es de agricultura, que yo no sé; él, sí; yo le dije que iba a hablar con mi hermano.

"LA CORTE: ¿Ella le dijo que Rosendo estaba interesado, que si ustedes tenían interés?

"Sí. Que hablaría con mi hermano. Como ella no le habla mucho a mi hermano, me dijo 'Habla con tu hermano y dícelo.' Una semana u ocho o diez días después hablé con él."

Como tercer testigo declara José Ramón Quiñones. Sobre lo pertinente a estas conclusiones de hecho, manifiesta en su examen directo: que hasta el 23 de mayo de 1954 estuvo en la ciudad de San Juan; en ese día tuvo que salir de Puerto

Rico hacia los Estados Unidos, visitando las ciudades de Nueva York y Washington en gestiones de su cargo de presidente de la Asociación de Agricultores, y a la de Chicago, donde se celebraba una convención sobre radio y televisión; regresó a Puerto Rico en la noche del 3 de junio siguiente; el 10 de ese mes de junio lo llamó por teléfono, desde Mayagüez, el letrado Oscar Souffront informándole "que Rosendo Quiñones había estado en su oficina y le había dicho que había comprado las participaciones de mi hermana Sara y de mi hermana Antonia en los terrenos nuestros"; que Souffront "no me pudo dar ni el precio ni las condiciones, pero sí me dijo que Rosendo le había dicho que el Lic. Suau, de San Juan, había hecho la escritura"; que al terminar la conversación telefónica llamó al licenciado López Acosta, de San Germán, (3) a quien, luego de relatarle la anterior conversación con Souffront, le suplicó que fuera al Registro de la Propiedad de San Germán a ver si en él se había "inscrito ese condominio que decía Rosendo le había comprado a mis hermanas y le suplicaba que me notificase a la mayor brevedad posible. Yo acababa de conocer eso. Entonces él me puso un telegrama"; (4) al otro día 11 de junio recibió una carta de López Acosta sobre la no inscripción de la venta de las participaciones a Rosendo; (5) que el día 11 de junio le escribió al

---

(3) Fue admitido como evidencia otro Estado de Llamadas A Larga Distancia de la Porto Rico Telephone Company, correspondiente al mes de junio de 1954, en el que figura una llamada hecha el día 10 de ese mes por "Quiñones" a "E. L. Acosta" que duró 8 minutos.

(4) Dice el telegrama: "32 J CJ 3:30 PM 11 PD. SAN GERMAN. 10 JUNE 1954. LCDO. JOSÉ RAMÓN QUIÑONES, WAPA, PTA. DE TIERRA. NO APARECE INSCRITA NI PRESENTADA DOCUMENTACIÓN INDICADA POR TELÉFONO. ESCRIBO CORREO. E. LÓPEZ ACOSTA. 5.01 PM." (Ex. 7 Dtes.)

(5) Su texto es el siguiente:

"10 de junio de 1954.—Lcdo. José Ramón Quiñones, WAPA, San Juan, Puerto Rico.—Estimado amigo y compañero:

"Ampliando mi telegrama, y de acuerdo con tu información por teléfono, he buscado en el Registro de la Propiedad de San Germán, y no he encontrado ninguna escritura de venta de condominios presentada ni inscrita a nombre de Rosendo.

Lic. Eusebio López Acosta, de San Germán, una carta suplicándole que estuviera pendiente de la presentación de la escritura de venta en el Registro; (6) que en el mismo día 11 de junio visitó en San Juan el bufete del notario Salvador Suau, quien había autorizado la escritura de venta de los condominios otorgada el 24 de mayo anterior; que entonces fue que le enseñó la escritura y "yo quedé enterado de que, efectivamente, mis dos hermanas aparecían vendiéndole a Rosendo Quiñones el 25 de mayo sus participaciones en los condominios"; que antes de esa fecha no conocía en absoluto ni sabía nada "ni en qué condiciones pretendía Rosendo comprarle a mis hermanas, ni el valor por el cual le pagaban ni nada en absoluto"; le dijo al notario que le expidiera una copia de esa escritura para enseñársela a su hermano Segis-

---

"Además busqué la finca a nombre de don Tomás Quiñones Guzmán, tampoco aparece inscrita, ni a favor de doña Sarah, doña Antonia, tuyo, ni de ninguna otra persona. En el índice de fincas no aparece ninguna finca de 15 cuerdas, radicada en el barrio Sabana Grande Abajo, término municipal de San Germán.

"Sería conveniente me suministraras por escrito mayor orientación, y en cualquier cosa que pueda cooperar contigo sabes que estoy a tus órdenes incondicionalmente.—Afmo. amigo y compañero, (fdo.) E. López Acosta." (Ex. 8, Dtes.)

El matasello del sobre en que esa carta se remitió tiene la fecha del 10 de junio y la hora de 7 P.M.

(6) Esta carta dice así:

"11 de junio de 1954.—Lcdo. Eusebio López Acosta, San Germán.— Estimado amigo y compañero:—Acabo de recibir el telegrama de fecha de ayer, que lee como sigue:

"NO APARECE INSCRITA NI PRESENTADA DOCUMENTACIÓN INDICADA POR TELÉFONO. ESCRIBO CORREO.

"Ruégote estés atento si radican la escritura sobre el terreno de que hemos hablado por teléfono y a que se refiere tu telegrama. Si necesario, paga a cualquier persona para que esté pendiente de esto. Tuyo afmo., (fdo.) José Ramón Quiñones."

Esta carta aparece contestada por el Lic. López Acosta por otra que éste escribió el 23 de junio de 1954, en la que le informa a José Ramón Quiñones, en parte, lo siguiente:

"En mi poder tu atenta de fecha 11 de junio del corriente año, y tengo el gusto de comunicarte que aún no ha sido presentada al Registro de la Propiedad, la escritura de compraventa en la cual tienes interés." (Ex. 17, Dtes.)

mundo y dicho notario se la expidió y entregó el 12 de junio de 1954; (7) que después le enseñó a su hermano la escritura y le explicó su contenido; que "entonces resolvimos una acción por entender que teníamos derecho a un retracto puesto que esa finca era de mi abuelo José Ramón Quiñones y Quiñones, que es el nombre mío, y de Francisca Quiñones, el nombre de mi tía, y nosotros interesábamos que esos terrenos se quedaran en la familia, porque la experiencia mía ha sido que el que vende los terrenos tarde o temprano se queda en la calle"; que encargaron la tramitación de la acción de retracto al Lic. Acosta Velarde "el 13 ó 14" de junio de 1954. (8)

En repregunta, respecto a las cuestiones determinadas por las primeras dos conclusiones, declaró que antes del 10 de junio de 1954 el letrado Souffront le había dicho que su hermana Sara deseaba que su señora madre le prestara $2,000 y que Sara quería que se terminara la declaratoria de herederos de la tía Paca Quiñones y que, en esa ocasión, Souffront "me habló que Rosendo estaba detrás de ella para que le vendiera el condominio y yo le dije a Oscar [Souffront] que yo tenía que pensar eso seriamente . . ."; que había dicho a su hermana Sara que "estaría ausente debido a la situación azucarera que agravó en Washington" y por eso "tuve que salir para Estados Unidos el 23 de mayo"; que cuando

---

(7) Esta copia fue ofrecida y admitida en evidencia como Exhibit 2 de los demandantes, y aparece que fue librada, efectivamente, el 12 de junio de 1954 "a petición de don José Ramón Quiñones, hermano de las otorgantes".

(8) Al llegar a esa parte del testimonio de José Ramón Quiñones, su abogado el Lic. Acosta Velarde le llamó la atención al tribunal hacia el hecho de que la demanda había sido hecha con cierta premura y que tenía que admitir "el error que hay en la escritura" y se refería a que aparecía de la copia certificada de la escritura de venta de condominios que se le entregó para redactar la demanda de retracto que el predio principal tenía una cabida de 66.50 cuerdas cuando en realidad su cabida correcta desde el 21 de enero de 1944 era de 49.75 cuerdas, como resultado de la segregación que para esa fecha se le hizo de una parcela de 16.75 cuerdas. La demanda aparece fechada el 14 de junio pero radicada al día siguiente.

Souffront le habló de la venta de los condominios le había contestado: "Lo pensaré." Varias veces afirmó que no había autorizado a Souffront a comunicarle a su hermana Sara que ella podía vender su condominio a Rosendo si Segismundo no interesaba comprarlo; que entendía que lo que el primer párrafo de la carta del 19 de mayo de 1954, escrita a Sara por Souffront—véase escolio 2, pág. 239—era "que si Segis estaba dispuesto a adquirir yo entonces no tendría objeción porque se iba a quedar en la familia" [9] Declaró, además, que no se había comunicado con Souffront, en forma o modo alguno, durante el período transcurrido desde su regreso a Puerto Rico en la noche del 3 de junio hasta el momento de llamarlo Souffront, por teléfono, desde Mayagüez, el 10 de junio siguiente; que aun cuando conocía las intenciones que Sara tenía de vender su condominio a Rosendo "no pensé que ellos harían el negocio sin consultarme o por lo menos decir 'Mira, Mon, nosotros vamos a hacer esto. ¿Tú tienes interés?' "; que Souffront tampoco le había dicho eso, que "Una cosa es que digan que fulano de tal me ha hablado de comprar tal cosa y otra cosa es que me digan 'Vamos a cerrar un negocio. ¿Tú quieres o no?' "; que el precio de venta que se hizo a Rosendo era bajo.

De su repregunta reproducimos lo que sigue:

"¿Usted recibió la escritura de manos del Lic. Suau el mismo día que se la pidió?

_____

[9] De las páginas 375 y 385 primera pieza de la transcripción, tomamos lo siguiente:

"LA CORTE: ¿Usted autorizó en alguna ocasión al Lic. Souffront a comunicarle a su hermana Sara que ustedes estaban conformes con que ella le vendiera su condominio al demandado Rosendo Quiñones si Segismundo no interesaba comprar?

"TESTIGO: En ningún momento. En ningún momento ni a Souffront ni a nadie he autorizado ni he consentido que esos condominios se vendan."

. . . . . . . .

"LA CORTE: ¿Usted en ningún momento le manifestó a Souffront que usted no tuviese interés en comprar ese condominio de sus hermanas?

"¡Ah! no, ni a él ni a nadie. Ni a Souffront ni a nadie. La escritura . . . Yo salí el 23 de mayo de Puerto Rico, el veinticinco se firmó la escritura estando yo en Washington, hospedado en el Mayflower."

No, señor. Yo fui a ver a Suau a su oficina el once, él me enseñó la escritura, yo le pedí copia, me dice 'Yo te la mando mañana.' Al otro día me la mandó. El doce. La escritura después de esa carta habida.

LIC. NEGRÓN: ¿Qué hizo usted con esa escritura cuando se la entregó el Lic. Suau?

TESTIGO: Yo la leí completa y llamé a mi hermano. 'Mira, chico, ¿qué es esto?' Me dice 'Yo no sé nada de esto.' Dije 'Cará!, ¿cómo es posible esto?'

¿Quién dijo eso?

Yo lo dije. 'Que a espaldas nuestras!'

Su hermano, ¿qué dijo?

Ah!, que él tampoco sabía nada de eso. 'No, no, yo no sé nada de la escritura ésa ni que iban a firmar contrato ni nada.' Entonces fue que yo me dirigí a Acosta Velarde.

Cuando usted fue, cuando usted leyó la escritura en la oficina de Suau, usted le dijo, usted manifestó a pregunta del compañero Acosta Velarde que estaba sorprendido, que se sorprendió hasta el extremo de que 'Deme copia de esa escritura para mostrársela a mi hermano.'

Sí, es verdad. Figúrese usted!, si nosotros no sabíamos en cuánto habían vendido, ni en qué condiciones habían vendido. Bueno, nada.

LIC. NEGRÓN: ¿De manera que en ese momento su intención era mostrarle la copia de la escritura a su hermano?

Hombre, no faltaba más!

¿Y en qué momento, entonces, fue que surgió el propósito de llevar un caso de retracto?

En seguida que yo hablé con Acosta Velarde. Le dije, 'Mira lo que han hecho a espaldas mías.' "

*De la parte demandada:* Su primer testigo fue el notario Salvador Suau Carbonell. En esencia declaró: Que conoce a los hermanos Sara, Antonia, Segismundo y José Ramón Quiñones; como notario autorizó la escritura número 7, otorgada en su despacho notarial de San Juan el 25 de mayo de 1954, sobre compraventa de condominios, por las dos primeras como vendedoras y Rosendo Quiñones Irizarry como comprador; no recordaba haber visto la carta del 19 de mayo de

1954 escrita por Souffront a Sara Quiñones; después de otorgarse la escritura de venta le indicó a los otorgantes "que el contrato se había formalizado y que tenían que notificar de manera fehaciente a los otros condueños de la finca para que ejercieran el derecho de retracto que les correspondía de acuerdo con el Código Civil dentro de los nueve días de haber sido notificados"; a esos efectos dictó una carta de notificación dirigida a José Ramón y Segismundo Quiñones, para ser firmada por Sara y Antonia Quiñones, informando a aquéllos "el otorgamiento que se acababa de consumar ante mí en esa misma fecha y por la escritura que está aquí presentada"; esa carta fue "entregada a doña Antonia para que la echara al correo certificada"; negó haber escrito una carta fechada el 23 de abril de 1954; recordaba que Rosendo "me habló de algo que dice esta carta de Souffront; y de que el asunto estaba ya arreglado con el bufete de Souffront."

Repreguntado por el letrado de los demandantes declaró que no había enviado la carta de notificación que redactó el 25 de mayo; que luego se enteró de que la misma no había llegado a manos de José Ramón y Segismundo Quiñones por mediación del primero de éstos "*cuando acudió a mi despacho unas semanas después preguntándome si tal documento o escritura de traspaso existía* y yo le dije que sí, le notifiqué la fecha y él me dijo 'Yo me he enterado por otro conducto del otorgamiento de esa escritura, hazme el favor de librarme una copia inmediatamente que yo la mandaré a buscar.' Le libré una copia con fecha doce de junio, me parece."

Antonia Quiñones fue la segunda testigo del demandado. Declaró que recibió la carta de Rosendo proponiéndole la compra de su participación.—Su texto aparece en el escolio (1) pág. 236.—No le dio importancia a la carta porque le "compraba una cosa que yo no sabía que existía"; que consultaron con el abogado Salvador Suau y éste le dijo "que sí, que había ciertos requisitos"; que Suau preparó una carta dirigida a José Ramón y Segismundo Quiñones, con fecha 23

de abril de 1954, sobre la venta de los condominios; ([10]) que por la noche—del 23 de abril de 1954—fue a casa de su hermano y dijo lo que habían hablado con Suau; que Segismundo leyó dos veces la carta "que escribió Suau"; y le dijo: "No, yo no tengo interés en esto ninguno" y que "él hablaría con mi hermano Mon"; que ella le dijo "Hazlo"; "que pasaron días y días y no me contestó"; que llamó entonces a Segismundo y éste le dijo que era muy difícil conseguir a su hermano y que él no lo veía; que lo vería en esos días; le informó eso a su hermana Sara y ésta le dijo "Yo lo arreglo. Ya tú verás como yo lo arreglo"; que "al tiempo, una semana o

---

([10]) Esta carta, que Suau dijo no haberla escrito, copiada literalmente dice:

"23 de abril de 1954

"Sres. Don José Ramón Quiñones
y Segismundo Quiñones
c/o Estación W.A.P.A.
San Juan, Puerto Rico

"Queridos hermanos:

"Motiva la presente participarles que recientemente hemos recibido de nuestro primo, Don Rosendo Quiñones Irizarry, una proposición de compra sobre los condominios que nos pertenecen a nosotras sobre tres porciones de terreno que en junto suman 75 cuerdas 96 céntimos, radicada en el barrio de Sábana Grande abajo, del término municipal de San Germán. La proposición que nos hace Rosendo es de $2,000 por cada condominio, y considerando esta oferta como conveniente y aceptable a nosotras, estamos dispuestas a venderle dichos condominios a nuestro primo Rosendo Quiñones Irizarry, lo que le notificamos a ustedes dos a los efectos legales pertinentes, porque pensamos otorgarle la escritura de venta de un momento a otro.

"En espera de una respuesta sobre el asunto, quedamos, Vuestras hermanas que les aprecia,"

Se admitieron como Exhibits U y V del demandado dos copias carbón de esa carta. La marcada V tiene unido un documento escrito por Sara Quiñones, que se marcó Exhibit W y dice:
"Querido Rosendo:

"Por si a tu abogado le pudiese ser útil, esta fue la carta que Suau dictó para enviarle a Segis, pero que al Segis hablar con Toña y yo, nos dijo por parte de él no había dificultad en vender no le enviamos, pero estaba firmada y todo por nosotros para unírsela; pero dijo no era necesario en aquel entonces. La de Mon al yo tener la carta de Sufron no se mandó tampoco. Sara."

dos semanas . . . me llama y me dice 'Tengo una carta que me ha escrito Souffront donde me dice que habló con Mon y está todo solucionado, vete donde Suau a la carrera, quiero que firmes, que yo salgo.' Fuí donde Suau y firmé la escritura"; que Suau preparó la carta del 23 de abril y la escritura y "más ninguna"; que no habló con su hermano Mon en relación con el negocio; que ella se quedó con la carta que Segis leyó, y la guardó entre los papeles de ella una copia que después entregó al demandado.

El último testigo de la parte demandada, respecto a los hechos determinados por esas dos primeras conclusiones, fue el propio demandado. En su examen directo declaró que escribió y envió a Sara y Antonia Quiñones las cartas del 13 de abril de 1954, proponiéndoles la compra de sus participaciones; que vio en San Juan a Sara y Antonia el 23 de abril de 1954 y en casa de su hermano Norberto y luego·fueron a la notaría de Suau; que éste les sugirió que "Mon y Segis tuvieran conocimiento de la compra"; que Suau dictó una carta ese día dirigida a José Ramón y Segismundo Quiñones que Antonia "consideró muy seria" y ella dijo que hablaría personalmente con su hermano Segismundo; que después lo llamaron para que regresara a San Juan "porque tenían carta de Souffront"; que cuando vino a San Juan el 25 de mayo de 1954 Sara le manifestó "que habían hablado con Segis y Segis quedó en hablar con Mon"; que llamó a Souffront por teléfono a San Juan; Souffront fue a San Juan y habló con Mon; que cuando Souffront vino a Mayagüez escribió diciendo lo que dice la carta; que Sara en ese día y en casa de su hermano Norberto le enseñó la carta de Souffront y que Toña había dicho que fuera a la oficina de Suau para efectuar la venta de los condominios; que allí Sara le mostró la carta de Souffront a Suau y éste la leyó; que en ese día 25 de mayo se firmó la escritura y que Suau, luego de ver la carta, dijo que con esa carta "no hay problema ninguno, se puede hacer la escritura"; que en esa fecha Suau no dictó carta alguna,

ni Sara ni Antonia firmaron ninguna carta ese día de la venta y todos "salimos juntos ese día de la oficina de Suau"; que la única carta hecha por Suau fue la del 23 de abril; que regresó a Mayagüez el mismo día veinticinco de mayo y al otro día fue donde Souffront, y le dijo a éste que había comprado los condominios a Sara y a Antonia y le mostró la "escritura al Lic. Souffront" y le pidió a éste que le avisara a Mon para que no trabajaran los terrenos que él había comprado, que interesaba tener libre paso para la finca y que se lo dijo a Alberto Márquez, "mayordomo y muy amigo de Mon"; que le encomendó al Lic. Souffront que le aconsejara a Mon que le "deslindara la parcela esa lo más rápido posible porque yo quería tener paso para las siete cuerdas que tenía que cultivar"; que fue donde Souffront porque "Souffront siempre se ha entendido con los asuntos de él; como son muy amigos y el único, la persona más cercana a él, que se comunican"; que no trató de ver personalmente a José Ramón Quiñones y que éste "no me hablaba" desde "después de darme las dieciséis cuerdas"; que Alberto Márquez es el administrador de todas las fincas de José Ramón Quiñones y conocía sus problemas; que fue el día 26 de mayo que llevó la escritura al Lic. Souffront y le explicó la transacción que había hecho y Souffront la leyó ese día.

En la repregunta declaró que cuando fue a ver a Alberto Márquez fue solo y que le enseñó la escritura de compra de los condominios y Márquez la leyó; que fue donde éste "porque el señor Quiñones no me habla a mí".

Como prueba de refutación los retrayentes ofrecieron el testimonio de Alberto Márquez a quien había hecho referencia Rosendo al declarar. Márquez, entre otras cosas, manifestó que era agricultor y se dedicaba al cultivo de una finca de la cual era condueño; que no tenía mandato o poder por escrito de José Ramón Quiñones ni era su empleado, ni recibía sueldo de él; pero que lo había ayudado desde el 1944 en el manejo de las fincas a petición de la Asociación de Agricultores; "le

atiendo cualquier problema que se presente"; que conoce a Rosendo Quiñones y que éste había ido una noche con su señora a su casa; que nunca Rosendo le demostró algún documento de compra de tierras ni le enseñó escritura alguna; que el motivo por el cual lo visitaba era para pedir autorización para sacar sus cañas por un callejón propiedad de José Ramón Quiñones; que Rosendo nunca le dijo haber comprado condominios a Sara y Antonia Quiñones; que cuando Rosendo le pedía permiso para poder cruzar la propiedad "algunas veces, por yo no tener autorización hasta me comunicaba con el señor Quiñones".

En la repregunta declaró que el mayordomo de las fincas de Quiñones era Ramón Collado; que éste pagaba los trabajadores de la finca con dinero que iba a buscar al banco de Mayagüez; que su oficina es distinta a la de José Ramón Quiñones y éste nada le pagaba "por la administración" y que le había ayudado catorce años "sin cobrar un centavo", debido a la ayuda que Quiñones había prestado a los agricultores "en una situación muy seria", para lo cual Quiñones abandonó sus intereses para defender la clase agrícola y en ello "Quiñones se rasca su bolsillo mucho . . .", y por eso le prestó sus servicios sin paga; que Rosendo nunca le mostró escritura alguna, ni a él le pidió deslinde; repitió que para darle permiso a Rosendo tenía que consultar con Quiñones, pues no era su apoderado.

Así resumida, ésa fue la prueba esencial aportada por las partes en torno a los hechos que se desarrollaron desde el 13 de abril de 1954 en que Rosendo propone la compra de los condominios hasta el 15 de junio de 1954 en que se inicia la acción de retracto por José Ramón y Segismundo Quiñones.

Se observarán marcadas contradicciones entre una y otra evidencia respecto a varios puntos; a veces la de una parte está así misma en conflicto. Pero de esas contradicciones y conflictos dispuso el juez sentenciador en favor de la parte

demandante-recurrida en el proceso de aquilatar el valor probatorio y estimar la preponderancia de la evidencia.

La primera conclusión de hecho realmente no se impugna. Determina hechos alegados en la demanda y aceptados en la contestación y relativos al otorgamiento de la escritura de venta que originó el retracto y la circunstancia de que esa venta no fue inscrita en el Registro de la Propiedad.

A juicio nuestro las conclusiones de hecho números 2 y 3, encuentran amplio apoyo en la evidencia presentada y creída por el tribunal de instancia. De ninguna evidencia, aun concediendo pleno e incondicional crédito a toda la presentada por el demandado, resulta que los hermanos José Ramón y Segismundo Quiñones, en forma explícita, clara, terminante y definitiva, "manifestaron su decisión de no comprar los condominios objeto del retracto y consintieron en la venta al recurrente", como afirma éste—sin que tengamos de momento que discutir su validez y la eficacia obstativa sobre el ejercicio de la acción de retracto una vez nacido el derecho a retraer. La carta escrita por Souffront en 19 de mayo de 1954 no revela tal decisión y consentimiento absoluto, sólo se refiere a que Segismundo resolvería si quería hacer uso del derecho de retracto de comuneros y adquirir las participaciones o consentir en la venta. Esta carta fue cursada el mismo día 19 de mayo de 1954; a partir de tal fecha ni Sara, ni Antonia, ni Rosendo, ni Souffront, hablan con Segismundo ni éste se comunica con ellos. La última vez que Antonia habló con él, ocurrió días antes de escribir Souffront esa carta.

El propio letrado Souffront, cuando se le repregunta, respecto al contenido de esa carta, si la autorización de José Ramón Quiñones "estaba dada según esta carta", contestó: "No. Dependiendo del interés que pudiera tener Segismundo" —pág. 70, primera pieza, Tr.

No hubo prueba alguna de que José Ramón y Segismundo Quiñones se enteraron de la venta de los condominios "antes

de otorgarse la escritura de compraventa—sin que por ahora discutamos la trascendencia jurídica de tal conocimiento anterior—y que fueron notificados del otorgamiento de dicha escritura el día 26 de mayo de 1954, o sea, más de nueve días antes de la radicación de la demanda de retracto", como también afirma el recurrente. Primero, porque es imposible enterarse de un hecho que aun no ha acaecido y menos estándose ausente de Puerto Rico; segundo, porque la única comunicación de la venta a José Ramón Quiñones, que en derecho podía obligarlo de considerarse suficiente, fue la que le hizo su amigo íntimo, compadre, abogado y notario y "casi hermano" Souffront, por teléfono, en la mañana del 10 de junio de 1954, en la que sólo se le dio una simple noticia de la venta y el nombre del notario que la autorizó, noticia que José Ramón Quiñones pasó en seguida a Segismundo.

Obviamente la afirmación de Rosendo Quiñones Irizarry de haber enterado en detalle de la venta a Souffront y que éste leyó la escritura el 26 de mayo, un día después de otorgada y de haber hecho lo mismo después con Alberto Márquez, no le mereció crédito alguno al tribunal de instancia, aparte de que el simple conocimiento por estas personas de la venta jamás constituiría el punto de partida para contarse los nueve días para el ejercicio de la acción.

La prueba revela curiosas circunstancias que no eran las ideales para que los dos hermanos Quiñones pudieran obtener pronto y exacto conocimiento de la enajenación: (1) se consuma después que José Ramón Quiñones se va para Estados Unidos; (2) no se presenta la escritura para su inscripción registral; (3) no se les remite la carta de notificación de venta que, según dijo el notario Suau, él redactó el día de la venta, (al igual que no se les envió la carta del 23 de abril de 1954 avisándoles de la oferta de Rosendo), aconsejando su remisión inmediata por correo certificado; (4) pasados 15 días de la consumación de la venta es que Rosendo le informa de ella a Souffront; (5) ni Antonia ni Rosendo "se hablaban" con José Ramón Quiñones.

Es muy convincente la prueba oral y documental, no contradicha, de los retrayentes respecto a que el primer momento en que tuvieron noticia de la consumación de la venta de los condominios fue en el día 10 de junio de 1954, y de que no fue hasta los días 11 y 12 de junio que tuvieron pleno y completo conocimiento de la enajenación. Consistió (1) en los testimonios de José Ramón Quiñones y del letrado Souffront, sobre la llamada telefónica de éste a aquél del 10 de junio de 1954, corroborados en parte por el Estado de Llamadas A Larga Distancia, correspondiente a junio de 1954, preparado por la compañía telefónica—Ex. 6, demandantes—en relación con el teléfono de la oficina de ese letrado; (2) en las conversaciones telefónicas entre José Ramón Quiñones y el Lic. Eusebio López Acosta, de San Germán, de ese mismo día y del siguiente día 11 de junio, corroboradas por el otro Estado de Llamadas A Larga Distancia, de junio de 1954, de la oficina del retrayente José Ramón Quiñones—Ex. 15, demandantes—por el telegrama del 10 de junio de 1954 enviado desde San Germán a José Ramón Quiñones, por López Acosta—Ex. 7, demandantes— por la carta de López Acosta, del 10 de junio de 1954, a José Ramón Quiñones—Ex. 8, demandantes—y por la carta de Quiñones a López Acosta del 11 de junio—Ex. 16, demandantes—y, finalmente (3) en el testimonio del notario Salvador Suau Carbonell, testigo del demandado Rosendo Quiñones, corroborado por la fecha—12 de junio de 1954—de su certificación de la copia de la escritura de venta—Ex. 2, demandantes—que se le solicitó el día anterior por José Ramón Quiñones, y por la "nota de saca" puesta en su protocolo en 12 de junio, es decir, tres días antes de la radicación de la demanda de retracto.

Tiene razón el recurrente cuando afirma en su alegato —pág. 25—que erró el tribunal sentenciador al concluir que al consumarse la venta los hermanos Quiñones estaban "considerando si interesaban o no comprar". La prueba no acre-

dita tal expresión. Empero, la prueba sí acredita que al consumarse la enajenación, toda consideración entre los dos hermanos Quiñones del problema estaba aplazada y pendiente del regreso de Estados Unidos de José Ramón Quiñones. Como, en parte, declaró Segismundo: "Yo hablé con mi hermana Antonia; como una semana u ocho días después hablé con mi hermano sobre lo que me había manifestado mi hermana. Entonces me dijo 'Eso vamos a estudiarlo.' Se quedó así y se fue a Estados Unidos"—págs. 164–165, primera pieza, Tr. En tales circunstancias ese ligero error no afecta derechos sustanciales de parte alguna y podríamos hacer caso omiso del mismo bajo la Regla 50.

■ Después del cuidadoso estudio y análisis que hemos hecho de toda la prueba oral y documental practicada por ambas partes, y de considerar a la luz de la misma las razones de las impugnaciones formuladas a las trece restantes conclusiones de hecho, y dando la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos (y de evaluar la eficacia probatoria de la evidencia documental, sin que esa evaluación nos obligue siempre), a juicio nuestro, esas conclusiones restantes también están suficientemente sostenidas por la prueba practicada, no son claramente erróneas, ni encontramos sustanciales motivos para alterarlas, y todas representan el conjunto de hechos más adecuado, racional y lógico que la prueba aportada en el pleito permitía determinar. Se hace innecesario proceder a una detallada exposición de la prueba relativa a cada una de ellas como lo hemos hecho respecto a las primeras tres. Sobre algunas de ellas—núms. 8, 9 y 10 —el propio recurrente admite que el error que les atribuye "no es importante para la dilucidación de los puntos básicos de la controversia en este caso"—pág. 26, alegato.

Como secuela, no adoptaremos ninguna de las "Conclusiones de Hecho Omitidas" que ahora nos propone el recurrente para sustituir en parte las del tribunal de instancia, y

que en ningún momento propuso ante aquél. Algunas se fundan en hechos que estima acreditados por la evidencia pero que el juez sentenciador se negó obviamente a declararlos probados. La omisión de otras no constituye error alguno.

## II

Procederemos ahora a considerar los errores atribuidos a las conclusiones de derecho. El tribunal de instancia formuló, separadamente, cinco respecto a la acción de retracto legal y seis sobre las acciones comprendidas en la contrademanda. El texto de las primeras es como sigue:

"*Conclusiones de Derecho.*

"Es meritoria la acción de retracto incoada por los demandantes, ya que la misma fue radicada en tiempo, procediendo la acción contra el demandado por ser éste un extraño a la comunidad.

"1. El artículo 1414 del Código Civil concede un término de 9 días para iniciar la acción, a contar ese término, en un caso como éste en que la venta no se inscribió en el Registro, *"desde que el retrayente hubiera tenido conocimiento de la venta,"* y en el caso de autos la prueba incontrovertida ha demostrado que los demandantes tuvieron conocimiento de la consumación de la venta de los condominios de sus hermanas al demandado el 10 de junio de 1954, habiéndose radicado la acción de retracto cinco días después.

"2. El hecho de que los demandantes tuviesen conocimiento desde algunos días antes de formalizarse la venta de esos condominios de que sus hermanas tenían la intención de vender y que el demandado estaba interesado en comprar no afecta el derecho de los demandantes a hacer uso de la acción de retracto, ya que no fue hasta después de otorgada la escritura de venta que surgió su derecho a retrotraer los condominios, Castán, *Derecho Civil Español,* ed. 1952, tomo 4, página 142; Manresa, *Comentarios al Código Civil,* 5ta. edición Revisada, vol. 10, p. 395, no pudiendo sostenerse a base de la prueba presentada, que los demandantes hubiesen renunciado a su derecho de adquirir esos condominios de sus hermanas antes de que éstas le vendieran al demandado (véase Conclusiones de Hecho #2, 3 y 4).

"3. La acción de retracto procede contra el demandado por ser éste un extraño a la comunidad. La escritura de división de comunidad mediante la cual el demandante le adjudicó al demandado en el año 1944 una parcela de 16.75 cuerdas en pago de su participación de una cuarta parte en estas tres fincas objeto de la acción de retracto es válida, ya que el demandante José Ramón Quiñones tenía poder suficiente del resto de los condueños para efectuar esa transacción (véase Conclusión de Hecho #12), siendo innecesaria la comparecencia de Doña Francisca Quiñones Guzmán en ese documento, ya que la obligación asumida por el demandante José Ramón Quiñones en cuanto al pago de una renta vitalicia a doña Francisca sólo gravaba la participación de dicho demandante en estas fincas, y tal gravamen quedó inalterado al efectuarse esa división de comunidad (véase Conclusión de Hecho #12).

"4. El hecho de que el demandante no tuviese poder escrito de su hermana Sara para comparecer en esa escritura tampoco puede servir de base para la impugnación de la validez de ese documento por el demandado. El señor José Ramón Quiñones declaró que tenía autorización verbal de su hermana para efectuar la transacción, no habiéndose presentado prueba para establecer el hecho de que ella hubiese cuestionado en algún momento durante el curso de todos estos años esa supuesta autoridad de su hermano, autorizando expresamente el artículo 1601 del Código Civil la constitución en forma *verbal* de un mandato *expreso,* que es lo único que se exige para que el mandatario pueda enajenar o disponer de una propiedad inmueble, artículo 1604, del Código Civil, siendo el único inconveniente del mandato verbal el impedir que la transacción que lleve a cabo el mandatario pueda inscribirse en el Registro en perjuicio de terceros, pudiendo estar sujeta además a que el supuesto mandante impugne en un futuro la certeza del mandato, sosteniéndose por ello que el contrato resulte anulable. *Colón* v. *Registrador,* 18 D.P.R. 125.

"5. Y aún en el supuesto de que la falta de poder suficiente de parte de Sara Quiñones y de Francisca Quiñones Guzmán pudiesen servir de base para invalidar esa escritura de división de comunidad, somos de opinión que la impugnación planteada por el demandado no debe prosperar, ya que doña Francisca Quiñones murió en el año 1954, antes de radicarse este pleito, consolidándose en el demandante José Ramón Quiñones cual-

quier derecho real que pudiese haber existido a favor de su tía, estando el demandado impedido de levantar la cuestión de falta de poder suficiente de Sara, ya que ello sólo le correspondería a la propia Sara Quiñones, máxime considerando que ella no fue incluida como parte en esta acción ni fue traída como testigo por ninguna de las partes, estando además el demandado impedido por su conducta aceptando como válida esa transacción durante todos estos años (véase Conclusión de Hecho #16) de impugnar ahora la validez de ese contrato. *Zayas* v. *Orraca*, 80 D.P.R. 339, 347, y Sentencias del Tribunal Supremo de España de 14 de marzo de 1911. Y en todo caso, aun cuando el demandado tuviese 'standing' para plantear ahora esta cuestión, la impugnación de este contrato por el demandado, levantada por éste por primera vez más de 11 años después de haberse formalizado la transacción resultaría prescrita a tenor con las disposiciones del artículo 1251 ó del artículo 1253 del Código Civil, los cuales fijan un término de 4 años para el ejercicio de esta acción."

Por la conclusión de derecho Núm. 1 se determina que la acción de retracto fue iniciada dentro del plazo fijado por el Art. 1414 de nuestro Código Civil; por la Núm. 2, que los retrayentes no renunciaron su derecho de retraer.

Impugna el recurrente la primera sosteniendo que ese plazo había transcurrido al comenzarse la acción porque debe computarse el plazo desde la fecha de la escritura de venta o sea desde el 25 de mayo de 1954. La segunda porque "los recurrentes habían renunciado su derecho al retracto". Agrega que el tribunal a quo "erróneamente no resolvió que los recurridos estaban obligados a establecer en el juicio como un hecho, su compromiso de no vender los condominios retraídos durante cuatro años".

No tiene razón el recurrente. El Art. 1414 de nuestro Código Civil dispone que "no podrá ejercitarse el derecho de retracto legal sino dentro de 9 días contados desde la inscripción en el registro, y en su defecto, desde que el retrayente hubiera tenido conocimiento de la venta". El tribunal a quo concluyó que los retrayentes tuvieron su primer conocimiento

de la venta el jueves 10 de junio de 1954. La acción se inició el martes 15 de junio, es decir, al quinto día del plazo legal. ([11])

Aun cuando judicialmente se hubiera concluido que Rosendo notificó a Souffront y a Alberto Márquez el 26 de mayo, y que éstos leyeran en ese día la escritura de venta, bajo ninguna circunstancia posible se hubiera podido determinar que el mero conocimiento por parte de esas dos personas obligaban en derecho a los hermanos Quiñones. Desde luego, si se hubiera determinado que Rosendo se comunicó efectivamente con ellos en ese día 26 de mayo y también que fue en ese día o en otro cualquiera anterior al 6 de junio de 1954, que Souffront o Márquez trasmitieron a los retrayentes la información de Rosendo, entonces al 15 de junio siguiente se hubiera encontrado caducado el derecho a retraer.

■ No es, como dice el recurrente, que "dicho término comenzó en la fecha del otorgamiento de la escritura y la consumación de la venta". Una cosa es el nacimiento del derecho

---

([11]) Toda vez que este plazo terminaba el sábado 19 de junio, en derecho vencía el lunes 21 de junio de 1954. Realmente el término empezó a contarse desde el día 11 de junio en que el retrayente José Ramón Quiñones estuvo en la oficina del notario Suau y allí leyó la escritura de venta y obtuvo completo y exacto conocimiento de los términos y condiciones de la misma que le ponían en condiciones de decidir la conveniencia de ejercitar o no la acción del retracto legal.

De la sentencia de 3 de diciembre de 1955 del Tribunal Supremo de España, citamos lo que sigue:

"La concisa expresión 'desde que el retrayente hubiese tenido conocimiento de la venta' no ha de entenderse en el sentido de que el plazo para demandar el retracto comienza a correr hacia su vencimiento de caducidad de la acción del retrayente desde el momento en que éste tiene noticia del hecho de la enajenación aunque desconozca los pactos y condiciones de la misma, *porque saber de tal elemental manera que una cosa ha sido vendida no es tener de la venta un conocimiento bastante para determinar la conveniencia de sustituir al comprador en los derechos y obligaciones que integran el contenido contractual y el derecho de subrogación* que es como el artículo 1.521 del Código Civil define el de retracto, *lo que presupone que el retrayente ha de conocer las obligaciones contraídas por el comprador en cuyo lugar ha de quedar subrogado, como se conocen por la publicidad del Registro de la Propiedad en virtud de la inscripción.*" (Énfasis suplido.)

a retraer definido por el Art. 1411 del Código Civil, y otra el ejercicio de la acción para hacer valer ese derecho que regula el 1414. El momento de esto último puede no coincidir con el momento de lo primero. No se remite al día de la consumación de la enajenación el cómputo del plazo fatal de caducidad de nueve días, sí a la fecha de la inscripcion, [12] y en su defecto, desde que el retrayente hubiera tenido conocimiento de la venta. [13]

Al decidir que la acción de retracto legal se ejercitó en tiempo, el tribunal de instancia aplicó rectamente el Art. 1414 del Código Civil.

 Tampoco tiene razón el recurrente al sostener que los retrayentes habían renunciado su derecho al retracto. Es cierto que el párrafo segundo del Art. 4 del Código Civil preceptúa que los derechos concedidos por las leyes son renun-

---

[12] Dice, en parte, la sentencia del 30 de setiembre de 1960, del Tribunal Supremo de España:

"El retracto legal nace desde que se realiza la venta de la cosa, por lo que es manifiesto que desde la fecha de tal conocimiento, y no desde la inscripción, debe contarse el plazo marcado para el derecho de retracto y no cabe entenderse que en todos los casos de inscripción sea la fecha de ésta la que sirva de punto de partida para empezar a contar el plazo, sino solamente para aquellos en que por no poderse acreditar si el retrayente tuvo o no noticia anterior se hacía preciso, para la seguridad de la propiedad, establecer una presunción juris et de iure del conocimiento basada en la publicidad del Registro, pues de otra suerte se daría más importancia a una mera suposición de la Ley que al hecho real y efectivo del conocimiento de la venta cumplidamente acreditado.

[13] La doctrina sentada en *Rosaly* v. *Ríos*, 63 D.P.R. 836, 841 (1944), que cita el recurrente, no le favorece. En ese caso, el 30 de setiembre de 1941 fue vendido cierto condominio en pública subasta; el retrayente tuvo entonces de ello conocimiento; la escritura de venta judicial fue otorgada el 28 de octubre siguiente; la acción de retracto fue iniciada el 6 de noviembre posterior. Invocada la "prescripción" a base de contarse los 9 días desde el 30 de setiembre, fecha del remate conocido por el demandante, resolvimos que el plazo no había transcurrido pues había empezado a correr desde el 28 de octubre, día de la consumación de la venta y no desde el 30 de setiembre, día del perfeccionamiento de la venta. En el presente recurso la enajenación se perfeccionó y consumó en un mismo acto del 25 de mayo de 1954, encontrándose fuera de Puerto Rico el retrayente con mayor interés.

ciables, a no ser esta renuncia contra la ley, el interés o el orden público, o en perjuicio de tercero. Pero la renuncia de derechos autorizada por ese artículo debe ser clara, terminante, explícita e inequívoca. Aunque se concede que puede ser expresa o tácita, la renuncia de derechos en general no se presume y es de estricta interpretación.[14] No es lícito deducirla de expresiones de dudosa significación. Asumiendo que fuera renunciable un derecho de retracto legal que no ha nacido, sin concreción alguna, cuya existencia futura no depende de acto alguno del renunciante sino de la voluntad exclusiva e independiente del condueño que puede vender, no existe en esa evidencia circunstancia alguna constitutiva de una renuncia explícita, clara y terminante. Lo más que puede decirse es que las hermanas Sara y Antonia Quiñones informaron a sus hermanos José Ramón y Segismundo que el primo de ellos, Rosendo Quiñones, ofrecía comprar sus condominios, y que si ellos no los compraban los venderían a Rosendo; en pocas palabras; nos compran o vendemos a Rosendo; que Segismundo dijo "que no estaba interesado en comprar", y José Ramón que "hablaría de ello con su hermano al regresar de Estados Unidos." Supongamos que ambos hubieran comunicado a sus hermanas, clara y categóricamente, que rehusaban comprar a ellas sus participaciones. ¿Perderían automáticamente por ello el derecho a retraerlas al consumarse la venta a favor de Rosendo?

En *Vellón* v. *Central Pasto Viejo*, 34 D.P.R. 233, 234 (1925), decidimos este punto en sentido negativo. En ese recurso se trataba de una acción de retracto legal de comuneros. El retrayente había adquirido por compra cierta finca rústica durante su matrimonio. Murió su esposa y parte de la finca fue heredada por algunos parientes. Éstos ofrecieron en venta sus derechos al cónyuge viudo retrayente y éste se negó a comprarlos. Entonces ellos vendieron sus participaciones indivisas sobre la finca a la Central Pasto Viejo. En

---

[14] Véase *Cabrera* v. *Doval*, 76 D.P.R. 777, 779 (1954).

tiempo ejercitó el viudo su acción de retracto legal de comuneros contra la adquirente. Se decretó el retracto. Apeló ante nos la demandada y señaló como segundo error el no estimar el tribunal a quo que habiéndose negado a comprar a los herederos, el demandante renunció su derecho a retraer. Sobre el punto resolvimos:

"Alteraremos el orden al analizar los errores. El segundo no se ha cometido, a nuestro juicio, porque no es contrario al espíritu de la ley que un copropietario que ha rehusado comprar de su copartícipe, cuando éste vende a un extraño sea que se decida, a los efectos de impedir que el extraño entre en la comunidad, a ejercitar su derecho de retracto. *En manera alguna puede entenderse que por el hecho de haberse negado a comprar al copartícipe, renunció su derecho al retracto, derecho que nace cuando la venta al extraño se realiza.* El apelante no cita precepto de ley alguno en apoyo de su contención." (Énfasis suplido.)

■ No erró el tribunal de instancia al dejar de resolver que los demandantes estaban obligados a establecer en juicio como un hecho, su compromiso de "no vender los condominios retraídos durante cuatro años", como apunta el recurrente.

En el párrafo 5 de la demanda de retracto se alegó: "Que los demandantes se comprometen a no vender durante 4 años el condominio que es objeto de este retracto." Este requisito especial para el ejercicio del retracto legal de comuneros—no se exige en los otros tipos de retractos—es una norma específica que obliga al retrayente a comprometerse a no vender la participación del dominio que retraiga durante cuatro años. Impone una obligación formal que ha de cumplirse en la demanda para acreditar la seriedad del interés del retrayente.

Respecto a la exposición de ese compromiso el demandado se limitó en su contestación a exponer: "Lo alegado en el párrafo anterior—en ese anterior párrafo, en síntesis alegó que no era un extraño a la comunidad y que, en contrario,

seguía siendo un comunero contra quien no procedía el retracto—se reproduce en oposición a la alegación quinta de la demanda."

En *Zalduondo* v. *Iturregui*, 83 D.P.R. 1, 22 (1961), frente a una situación semejante—con posterioridad a la presentación del alegato del recurrente—resolvimos:

"El retracto no debe ejercitarse con fines especulativos. Uno de sus propósitos es la extinción del estado de comunidad, que, como dice Escriche en su Diccionario, 'suele ser fuente perenne de discordias.' Como una medida para evitar la especulación se le exigía al retrayente antes de 1855 un juramento al efecto de que deseaba la finca para sí y no la retraía para fines especulativos. Esa medida y otras fueron incorporadas a la antigua ley procesal para asegurar el cumplimiento de la prohibición contra traspasos durante esos cuatro años. Siguiendo decisiones anteriores resolvimos en *Noble* v. *Rodríguez*, supra, a la pág. 492, que el retrayente debe alegar ese compromiso en su demanda.

"El recurrente no impugnó el compromiso por razón de ser falso o engañoso, o porque detrás del mismo existía un propósito especulativo. Repetimos que se limitó a decir que nada tenía que alegar contra el mismo por constituir una conclusión de derecho. Tal como entendemos lo que constituye una conclusión de derecho, no podemos aceptar que la simple exposición del compromiso a no vender pueda considerarse así. Esa posición del demandado no creó controversia alguna respecto al compromiso a no vender contenido en las demandas. Por otra parte, si la asunción de esa obligación es un requisito sustantivo necesario en esa acción, la forma en que la misma se contrajo es correcta. En las circunstancias del caso de autos no vemos necesidad de sustanciar en corte un compromiso ya debidamente contraído. Es cierto que la sentencia nada dispuso respecto al mismo. Pero eso no impide que la modifiquemos en debida forma."

■ Al comienzo expusimos que a la alegación de la demanda afirmando que Rosendo Quiñones Irizarry era un extraño a la comunidad de bienes constituida por los cuatro hermanos Quiñones y Quiñones sobre los tres predios de terrenos, aquél contestó que no lo era y que, en contrario, al

momento de adquirir los condominios de Sara y Antonia era un condueño de esos predios. En sus conclusiones de derecho núms. 3, 4 y 5, antes copiadas, determinó el tribunal de instancia que era un extraño y que procedía contra él dictarse sentencia dando lugar al retracto. Para la mejor comprensión del problema, a continuación daremos el historial jurídico de esos tres predios según resulta de la evidencia documental obrante en autos.

Don José Ramón Quiñones y Quiñones y su esposa Francisca Guzmán, abuelos paternos de los litigantes, en el año 1892 eran dueños de esos tres predios y de otros bienes; en ese año fallecieron sucediéndoles sus seis hijos llamados Rosendo, Tomás Ramón Canturriense, Francisco Mariano, María de los Dolores conocida por Francisca y Paca, Carlos Eladio y José Eladio, Quiñones Guzmán. En 1894 estos seis hijos procedieron al reparto de los bienes hereditarios, adjudicándose esos tres predios *pro indiviso* y por partes iguales a los cuatro hermanos llamados Rosendo, Tomás Ramón Canturriense, Francisco Mariano y María de los Dolores. A Carlos Eladio y José Eladio les fueron adjudicadas sus participaciones hereditarias en otros bienes.

Falleció el hijo Rosendo en noviembre de 1913, pasando su condominio de una cuarta parte en los tres predios a sus tres hijos Norberto Alfredo, Rosendo de Jesús—el recurrente —y Rafael Angel Quiñones Irizarry. Al distribuirse su herencia entre éstos en julio de 1923, toda esa cuarta parte indivisa fue adjudicada a Rosendo de Jesús, conocido por Rosendo Quiñones Irizarry.

Murió el hijo Tomás Ramón Canturriense, bajo testamento, en junio de 1918, estando casado con doña Antonia Quiñones. En la distribución de sus bienes, practicada judicialmente en el año 1918, el condominio de este causante de una cuarta parte sobre esos tres predios, fue adjudicado en nuda propiedad, por partes iguales, a sus cuatro hijos Sara, Antonia, Segismundo y José Ramón Quiñones Quiño-

nes. La propiedad útil o usufructo sobre todo ese condominio fue adjudicada a los hermanos del testador Francisco Mariano y doña María de los Dolores Quiñones Guzmán. (Está admitido por las partes que doña María tenía también, por lo menos nominalmente, el usufructo sobre la cuarta parte de su hermano Rosendo Quiñones Guzmán, que correspondió finalmente al recurrente Rosendo Quiñones Irizarry.)

Falleció el hijo Francisco Mariano Quiñones Guzmán el 31 de mayo de 1922, bajo testamento abierto otorgado en febrero de 1919, ante el notario Oscar Souffront, en el que instituyó como única y universal heredera suya a su hermana María de los Dolores, pasando a ésta su condominio de una cuarta parte y el usufructo indicados.

La hija sobreviviente, doña María de los Dolores, luego de heredar en 1922 a su hermano Francisco Mariano, se había convertido en plena titular de una mitad indivisa en propiedad de los tres predios y del usufructo de la cuarta parte heredada por los sucesores de su hermano Rosendo y de la restante cuarta parte heredada por la sucesión de su otro hermano Tomás Ramón Canturriense.

Por documento otorgado en la ciudad de Barcelona, España, el 3 de setiembre de 1941, ante Temple Wanamaker, Jr., vicecónsul de los Estados Unidos en esa ciudad, doña María de los Dolores Quiñones Guzmán, como dueña de once fincas rústicas situadas en el término municipal de San Germán, y, además, de una mitad indivisa en plena propiedad y del usufructo en la restante mitad indivisa, vendió a su sobrino el corretrayente José Ramón Quiñones y Quiñones todas esas once propiedades y sus participaciones indivisas en plena propiedad y usufructo sobre esos tres predios "en consideración a que el señor Quiñones ha de obligarse a entregar a la otorgante una renta de cuatrocientos dólares . . . mensuales durante la vida de ésta", con la condición de que el comprador se obligará "a aceptar este contrato en el término de seis meses a contar de hoy . . .". En efecto, fue aceptado

y ratificado ese contrato por José Ramón Quiñones, por escritura pública de fecha 20 de octubre de 1941. El valor, en conjunto, de los bienes y derechos así trasmitidos se fijó en $56,200.00. Al morir, en enero de 1954, doña María de los Dolores había recibido de José Ramón Quiñones "en virtud de la renta vitalicia convenida como precio de venta . . . una suma total de alrededor de $60,000.00".

Las participaciones indivisas o cuotas partes respecto a la comunidad de bienes sobre esos tres predios rústicos a que se refiere el retracto, existente entre los cuatro hermanos Quiñones y Quiñones y su primo Rosendo Quiñones Irizarry en el mes de mayo de 1942, eran las siguientes: a José Ramón le correspondía 9/16 partes, a Sara, 1/16, a Antonia, 1/16, a Segismundo, 1/16, y a Rosendo, 416 partes, sin tomarse en cuenta los derechos de usufructo trasmitidos al primero por su tía doña María.

Para mediados de 1942 pidió Rosendo la entrega material de su participación en la comunidad. Previa consulta entre los cuatro hermanos Quiñones y Quiñones se accedió a ello. Se mensuraron las fincas y se levantó un plano de las mismas por el ingeniero civil José D. Morales; se segregó entonces una parcela de 16.75 cuerdas del predio de mayor cabida, quedando reducida su área a 49.75 cuerdas, y de común acuerdo se entregó material de la parcela segregada de 16.75 cuerdas a Rosendo en pago definitivo de todos sus derechos y participaciones en los bienes de la comunidad, quedando Rosendo permanentemente separado de la misma, continuándose la comunidad respecto al resto de la finca principal y a las otras dos fincas pequeñas por Sara, Antonia, Segismundo y José Ramón, en la proporción que tenían en la cosa común.

Empezó Rosendo a cultivar y cultivó como dueño absoluto su predio de 16.75 cuerdas. En junio de 1942 pidió a los hermanos Quiñones que se hiciera constar en documento público la división material ya consumada.—Ver escolio 18. A

esos fines, se otorgó en Mayagüez, el 21 de enero de 1944, ante el notario Oscar Souffront una escritura pública, bajo el número 6, con el título de "División de Comunidad", en que comparecieron como únicos otorgantes: de una parte, José Ramón Quiñones y Quiñones, por su propio derecho y, además, como mandatario de su tía doña María, de su señora madre doña Antonia Quiñones vda. de Quiñones, y de sus hermanos Sara, Antonia y Segismundo, y de la otra parte el recurrente Rosendo Quiñones Irizarry. En el párrafo PRI-MERO de esa escritura se expuso que Rosendo era "dueño de un condominio por una cuarta parte indivisa en cada una" de las tres fincas que se describieron en la demanda de re-tracto. En el SEGUNDO se relacionó el modo en que se había adquirido ese condominio por Rosendo. En el TERCERO se expuso textualmente:

"TERCERO: Que el compareciente don José Ramón Qui-ñones y Quiñones es dueño de la mitad de cada una de dichas tres fincas descritas bajo las letras A, B y C, o sea tiene un condominio por una mitad indivisa en cada una de dichas tres fincas, los cuales condominios hubo según consta de la escritura otorgada en la ciudad de Barcelona, España, el día tres de sep-tiembre del año mil novecientos cuarenta y uno, ante el Vice-Cónsul de los Estados Unidos de América en dicha ciudad, Mr. Temple Wanamaker, Jr., por doña María de los Dolores Quiñones y Guzmán, conocida por doña Francisca o doña Paca Quiñones, y la cual escritura fue debidamente ratificada me-diante la escritura número ciento cuarenta y cinco otorgada en Mayagüez, a veinte de octubre del año mil novecientos cuarenta y uno, ante el notario fedante, sujetos dichos condominios adqui-ridos por el compareciente señor Quiñones-Quiñones al derecho de usufructo constituido a favor de dicha doña María de los Dolores Quiñones Guzmán, conocida por doña Francisca o doña Paca Quiñones mediante la misma escritura antes relacionada; y la sucesión de don Tomás Quiñones y Guzmán, compuesta de las personas ya mencionadas en la comparecencia de esta escri-tura, resulta ser dueña del otro condominio por una cuarta parte indivisa en cada una de dichas tres fincas anteriormente descritas bajo las letras A, B y C en el hecho primero de esta escritura."

En el CUARTO se declaró que "no deseando el compare-
ciente don Rosendo de Jesús Quiñones e Irizarry . . . per-
manecer en la comunidad indivisa con los demás condueños
de las tres fincas . . . los comparecientes *en el carácter que
ostentan*, han convenido en proceder a la división de la co-
munidad en cuanto a dicho condueño . . . don Rosendo . . .
se refiere, y a la definitiva adjudicación a dicho condueño de
su participación en pago de sus derechos en la comunidad en
dichas tres fincas; y al efecto a los fines ya relacionados, los
comparecientes, *en el carácter que ostentan*, segregan de la
finca descrita bajo la letra A [la de 66.50 cuerdas] una par-
cela de terreno que como finca aparte y para que como tal se
inscriba en el Registro de la Propiedad correspondiente se
describe así:"—se describe en la escritura la parcela se-
gregada de 16.75 cuerdas, que en el párrafo QUINTO se
valora en $3,350.00. En el SEXTO se describe el resto de la
finca principal con su nueva cabida de 49.75 cuerdas. En los
párrafos restantes convinieron:

"SEPTIMO: Convienen los comparecientes, en el carácter
que ostenta, en adjudicar al compareciente don Rosendo de Jesús
Quiñones e Irizarry, conocido por don Rosendo Quiñones Iri-
zarry por su parte en la comunidad indivisa en las tres fincas
anteriormente descritas bajo las letras A, B y C en el hecho
primero de esta escritura, la FRACCIÓN O PORCIÓN DE
TERRENO segregada de la finca descrita bajo la letra A y
descrita en el hecho cuarto de esta escritura, y al efecto el com-
pareciente don José Ramón Quiñones y Quiñones, por su propio
derecho, y además como mandatario de doña María de los Dolo-
res Quiñones y Guzmán, conocida por doña Francisca o doña
Paca Quiñones Guzmán, y como mandatario asimismo de la
sucesión de don Tomás Quiñones y Guzmán, compuesta de su
viuda doña Antonia Quiñones viuda de Quiñones, y de sus hijos
doña Sara, doña Antonia, don Segismundo Quiñones y Quiñones
y de él mismo, adjudica, cede y traspasa a favor de dicho don
Rosendo de Jesús Quiñones Irizarry, conocido por don Rosendo
Quiñones Irizarry todo el derecho, título e interés que dichos
condueños don José Ramón Quiñones y Quiñones, doña María
de los Dolores Quiñones y Guzmán, y la sucesión de don Tomás

Quiñones y Guzmán tienen y le pueda corresponder en dicha parcela de terreno segregada y descrita en el hecho cuarto de esta escritura, a fin de que dicho don Rosendo de Jesús Quiñones e Irizarry quede dueño en absoluto y en pleno dominio de dicha parcela de terreno y en pago y adjudicación de su participación en la comunidad indivisa en las tres fincas anteriormente descritas bajo las letras A, B y C en el hecho primero de esta escritura, y a fin de que dicha parcela de terreno pueda ser inscrita a su solo nombre como bienes privativos del mismo en el Registro de la Propiedad de San Germán; y asimismo don Rosendo de Jesús Quiñones e Irizarry, conocido por don Rosendo Quiñones Irizarry, por la presente cede, adjudica y traspasa a favor de los otros condueños de las fincas descritas bajo las letras A, B y C en el hecho primero de esta escritura, o sea a favor de don José Ramón Quiñones Quiñones, doña María de los Dolores Quiñones y Guzmán, conocida por doña Francisca o doña Paca Quiñones Guzmán y de la sucesión de don Tomás Quiñones Guzmán, compuesta de su viuda doña Antonia Quiñones viuda de Quiñones, y de sus hijos doña Sara, doña Antonia y don Segismundo Quiñones Quiñones y del compareciente don José Ramón Quiñones y Quiñones, en proporción y alcance al derecho de cada uno de ellos en la comunidad, todo el derecho, título e interés que dicho don Rosendo de Jesús Quiñones Irizarry, tenía y le correspondía como tal condueño en el remanente de la finca principal descrita bajo la letra A, cuyo remanente se describe en el hecho sexto de esta escritura, y en las fincas descritas bajo las letras B y C, las cuales fincas a virtud de dicha cesión quedan de la propiedad de las siguientes personas:—Dos terceras partes de cada una de dichas fincas pertenece al compareciente don José Ramón Quiñones y Quiñones, sujeto al derecho de usufructo aquí relacionado a favor de doña María de los Dolores Quiñones y Guzmán, conocida por doña Francisca o doña Paca Quiñones, y una tercera parte a favor de la sucesión de don Tomás Quiñones y Guzmán, compuesta de su viuda doña Antonia Quiñones viuda de Quiñones, y de sus hijos doña Sara, doña Antonia, don Segismundo y don José Ramón Quiñones y Quiñones.

"OCTAVO: Los comparecientes en esta escritura, en el carácter que ostentan, por la presente se otorgan mutuas y/o recíprocas cartas de pago y finiquito de cualquier reclamación que por cualquier concepto pudieran tener entre sí.

"NOVENO: Los comparecientes, en el carácter que ostentan, quedan obligados a la evicción y saneamiento de acuerdo a derecho.

"El compareciente don Rosendo de Jesús Quiñones Irizarry, conocido por don Rosendo Quiñones Irizarry, manifiesta que acepta esta escritura en todas sus partes por ser conforme a lo convenido, aceptando de conformidad la adjudicación que le ha sido hecha, y asimismo muestra su conformidad al total contenido de esta escritura."

Hemos dicho que desde la efectiva división de la comunidad realizada en mayo de 1942 y que fue ratificada por la escritura pública de enero de 1944, continuaron, por su parte, los cuatro hermanos Quiñones poseyendo en comunidad el resto de la finca principal y los otros dos predios, y por la suya continuó poseyendo Rosendo su parcela de 16.75, el forma independiente, y todo ello con justos títulos, de buena fe, quieta, pública y pacíficamentte, sin interrupción. Ver Conclusión de hecho núm. 16, pág. 17.

En 2 de mayo de 1951 Rosendo, mediante escritura pública, dio en arrendamiento su parcela de 16.75 cuerdas a José Quiñones Rodríguez, por el término de un año y por un canon anual de $700.00. Como propietario de la misma cultivó y molió a su nombre las cañas producidas por esa parcela, satisfizo contribuciones territoriales sobre la misma y las primas del Fondo del Seguro del Estado, cobró el importe de las cañas entregadas, los cheques de incentivo, compensación federal sobre cañas y el importe de mieles. En 8 de febrero de 1956, bajo juramento, en contestación a una pregunta que se le formuló en un interrogatorio de la parte demandante, declaró que desde abril de 1942 poseía material y físicamente la parcela de 16.75 que se le adjudicó "y aún la poseo". Contestando otra pregunta dio la información del arriendo reseñado.

Así transcurren doce años. Nadie impugna, ni cuestiona durante ellos la validez, existencia y eficacia de la división material de la comunidad realizada en abril o mayo de 1942,

ni imputa vicios de nulidad absoluta, ni de otra naturaleza, a la escritura de ratificación de esa división otorgada en enero de 1944. En 13 de abril de 1954 escribe Rosendo una carta a Sara Quiñones y otra a Antonia Quiñones proponiéndoles comprar las participaciones indivisas de ellas sobre los tres predios, informando a una de ellas, entre otras cosas: "Mi finca [se refiere a la parcela de 16.75 cuerdas] es tan pequeña que los condominios de ustedes unidos a mis tierras resolverían mi problema." Aparece su texto completo en el escolio 1. Ése fue el comienzo de esta controversia judicial.

Después de la anterior relación de circunstancias debidamente acreditadas en juicio, sigamos el estudio de las impugnaciones a las conclusiones de derecho núms. 3, 4 y 5 relativas a la acción de retracto. Arguye el recurrente que erró el juez sentenciador al concluir por las mismas (1) que José Ramón Quiñones tenía poder suficiente de sus representados para otorgar la escritura de división de comunidad; (2) que el recurrente estaba impedido de alegar esa insuficiencia y (3) que la acción estuviera prescrita.

Si fuéramos a juzgar la suficiencia de los poderes concedidos a José Ramón Quiñones por su tía María de los Dolores, por su señora madre Antonia Quiñones vda. de Quiñones y por sus hermanos Segismundo, Sara y Antonia Quiñones, a base exclusiva de la naturaleza y ámbito de las facultades otorgadas en las respectivas escrituras públicas de mandatos, (¹⁵) tendríamos que admitir que sólo la singular y especial dada por la hermana Sara—"para que acepte donaciones condicionales o incondicionales de bienes a nombre

_____

(¹⁵) La tía la otorgó el 20 de junio de 1922, ante el notario José Soto Rivera; su señora madre el 20 de enero de 1919, ante el notario Oscar Souffront; concediéndole por segunda vez poder por escritura de 24 de febrero de 1931, también ante Oscar Souffront; el hermano Segismundo, el 21 de abril de 1927, ante el notario Rafael Castro Fernández; la hermana Sara el 8 de junio de 1942, en la ciudad de Nueva York, protocolizándose su poder mediante la escritura de fecha 13 de julio de 1942, ante el notario Salvador Suau Carbonell.—Exhibits 3, 4, 5, 18 y 21, demandantes y Exhibit N, demandado.

de la mandante"— no era suficiente para proceder en su nombre a la división material de las fincas.

Sin embargo, dio por probado el tribunal a quo que la hermana Sara le había concedido verbalmente facultades para representarla en la división. ([16])

[16] La parte pertinente a esta cuestión del testimonio de José Ramón Quiñones (que no contradijo su hermana Antonia al declarar como testigo del demandado) y que tomamos de las págs. 276 a 279 y 281 de la Transcripción, pieza 1, es como sigue:

"En esa escritura de división de comunidad en que usted le entrega al señor Rosendo Quiñones una parcela de terreno de dieciséis y pico de cuerdas, o sea, la escritura otorgada ante el Lic. Oscar Souffront, escritura número 6 otorgada ante el Lic. Oscar Souffront el 21 de enero de 1944, Exhibit 1 del demandante, usted comparece ahí como apoderado de las distintas personas que se consignan en esa escritura. ¿Usted tenía algún poder de su hermana Antonia?

"TESTIGO: Por escrito, no. Yo le dije que Rosendo estaba molestando y molestando en el sentido . . ., quería que le diera la participación.

¿Quiere decir que le molestaba pidiéndole la participación?

Sí, señor.

"¿Usted tenía algún poder de su hermana Sara?

No. Escrito, no, pero en viaje a Estados Unidos les llamé la atención a ellas y ellas entonces convinieron que yo le entregara a Rosendo la participación de él, aunque de mi señora madre yo tengo un poder aceptando y un poder de mi hermano Segismundo, y se le entregó.

"LA CORTE: ¿Usted tenía un poder legal de su madre?

"TESTIGO: Sí, señor.

"LIC. ACOSTA: Han sido presentados en evidencia esos poderes.

"LA CORTE: ¿De sus hermanas tenía solamente un poder verbal?

"TESTIGO: Yo explique a ellas cuál era la situación.

"LA CORTE: ¿Ellas lo autorizaron a usted?

"TESTIGO: Y yo dije 'Vamos a salir de esto para que no me moleste más.' Yo le pagaba a él su participación con fondos míos.

"LIC. ACOSTA: Perdóneme un momento. Queremos aclarar. ¿Tenía usted poder general de sus dos hermanas Sara y Antonia o de cualquiera de ellas? ¿Sí o no?

De ellas dos, no.

¿Usted dice que consultó o habló con ellas?

Con Toña en San Juan y con Sara en Nueva York.

¿Habló sobre la cuestión de entregarle al señor Rosendo la participación que le correspondía?

De él.

¿Objetaron ellas a eso?

No objetaron. Por el contrario.

¿Por el contrario qué hicieron?

Respecto a la tía y a la señora madre de los hermanos Quiñones, concluimos que ninguna de ellas tenía algún derecho o interés de trascendencia real sobre las fincas que exigiera el consentimiento de ellas para efectuarse la división. Si él compareció a nombre de ellas, pudo deberse a exceso de precaución de su parte o de parte del notario autorizante. La primera, doña María, había trasmitido en el 1941 todos sus condominios, intereses, acciones y derechos sobre esas fincas a José Ramón Quiñones, sin que en forma alguna se gravaran, afectaran o sujetaran esos inmuebles en garantía de la obligación de pagar la renta vitalicia. La segunda como viuda de don Tomás Ramón Canturriense Quiñones Guzmán, jamás tuvo participación en el condominio hereditario de una cuarta parte que él tenía sobre esos bienes y que totalmente pasó, en nuda propiedad, a sus cuatro hijos y en usufructo a sus hermanos Francisco Mariano y María de los Dolores Quiñones Guzmán al realizarse la partición de su herencia en 1918.—Exhibit 19, demandantes; ver Cuaderno Particional, págs. 54 a 68. Ella renunció su cuota usufructuaria.

■ Puede ser que José Ramón Quiñones como tal mandatario se excediera en el uso o ejercicio de los mandatos de sus dos hermanas. Empero, esas mandantes quedaron obligadas al ratificar tácitamente la división por la conducta posterior de ellas, con arreglo a lo que preceptúa el Art. 1618

---

Cuando yo les dije que estaba molestando a pesar de que todos estos años ha estado arrendando los terrenos, le estaba mandando todos los años arrendamiento . . .

Lic. Acosta: ¿Qué fue lo que dijeron ellas?

Testigo: Que no tenían inconveniente; que sí.

¿Le autorizaron a Usted? ¿Sí o no?

Que sí.

Ésa es la pregunta.

Sí.

Lic. Acosta: ¿Y usted les informó a ellas el hecho?

Testigo: Les informé a ellas después que le entregué las participaciones."

del Código Civil. (¹⁷) Constituye una ratificación o convalidación tácita del contrato de división (independientemente del mandato verbal y expreso que ambas le concedieron para la división) los actos de Sara y Antonia gestionando la conformidad de Segismundo y José Ramón para ellas vender a Rosendo, a los fines de evitar el retractto porque éste era un extraño a la comunidad como consecuencia de la división material del 1944, y para que Rosendo pudiera unir los condominios de ellas a la finca que a él se adjudicó en aquella división, propósito que Rosendo les indicaba a ellas en las cartas del 23 de abril de 1954.

Como correctamente se expresó el tribunal a quo al aplicar el Art. 1601 del Código Civil que autoriza el mandato expreso "aun de palabra", el único inconveniente de constituirlo así es el de impedir que la transacción que lleve a cabo el mandatario pueda inscribirse en el Registro en perjuicio de terceros y el de estar sujeto a que su certeza pueda impugnarse.

Realizada en esas condiciones, la división material de la comunidad constituyó un contrato válido, eficaz y obligatorio para las partes y, sobre todo, para Rosendo Quiñones Irizarry que la promovió, solicitó y gestionó para beneficio propio y quien al realizar y aceptar por su parte esa división y trasmisión, aceptó como buenas y suficientes la comparecencia y actuación de José Ramón Quiñones por sí y como mandatario de los demás condueños. Arts. 1208, 1210, 1211 y 1230, Código Civil.

El transcurso de más de diez años desde la celebración de la división de la comunidad consumada en 1942, los actos continuos de Rosendo en concepto de dueño sobre esa finca segregada, como darla en arrendamiento, sus manifestacio-

---

(¹⁷) Dice este artículo:

"El mandante debe cumplir todas las obligaciones que el mandatario haya contraído dentro de los límites del mandato.

"En lo que el mandatario se haya excedido, no queda obligado el mandante sino cuando lo ratifica expresa o tácitamente."

nes escritas a Sara y Antonia sobre "mi finca" y "mis tierras" sin que se le ocurriera a él aducir o invocar tal nulidad, bastaban también para sanear en derecho cualquier vicio que hubiera afectado a aquella representación.

El contrato de división material por el cual Rosendo quedó para siempre separado de la comunidad y convertido en un extraño respecto a ella, jurídicamente se convino, perfeccionó y consumó a mediados del año 1942, época en que, previa mensura de las fincas practicada con intervención y asentimiento de Rosendo, se levanta de las mismas un plano para hacerle la segregación, adjudicación y entrega de la parcela de 16.75 cuerdas en pago de su participación en la comunidad; se hace en efecto la segregación de esa parcela y se entrega a Rosendo y éste acepta y recibe su posesión física como su exclusivo propietario y, en tal carácter, entonces comienza su inmediato cultivo y explotación. En la celebración, cumplimiento o consumación de ese contrato concurrieron y quedaron sustancialmente observados todos los requisitos de ley indispensables y esenciales para su validez, eficacia y obligatoriedad entre las partes. Después de transcurrir un año y seis meses de todo ello, a urgentes instancias de Rosendo[18] se hace constar la división por la escritura pública de enero de 1944 autorizada por el notario Oscar Souffront, cuya validez viene a impugnar por primera vez en 1955, a guisa de defensa en el retracto.

---

[18] En carta que en 15 de junio de 1942 escribe Rosendo a José Ramón Quiñones (con quien siempre se comunica y entiende para los asuntos de división de la comunidad), entre otras cosas le dice:

"Otro asunto de importancia que deseo indicarte en ésta es la gran urgencia que tengo de tener las *Escrituras sobre mi condominio, ya así asignado*, que me facilite poder hacer contrato de molienda con la Central, pagar contribuciones por mi parte, y tramitar mi cuota de las con la A.A.A. Yo hablé con Souffront, y éste me informó que como tú tienes toda la documentación de las fincas tienes que hablar con él seguida para ver de la manera que se pueda arreglar esto. Como este asunto de las Escrituras me urge más que nada, espero tú me arregles esto lo más rápido posible." (Exhibit CC, demandado. Las subrayadas son del propio Rosendo.)

■ No se trata, pues, de un contrato nulo e inexistente como sostiene, para resistir el retracto, el recurrente. Ni aun anulable. La impugnación de nulidad, para su mayor improcedencia, no la formulan las personas que supuesta y alegadamente fueron indebidamente representadas en la escritura de división, verdaderas titulares de tal acción de nulidad de haber existido la misma.

■ La prescripción extintiva de cuatro años señalada por el Art. 1253 del Código Civil fue también rectamente aplicada por el tribunal de instancia, si es que aquella división de comunidad hubiera podido considerarse anulable.

Obviamente, el recurrente, en el momento en que las comuneras le trasmitieron sus participaciones y al iniciarse el retracto, era un extraño respecto a la comunidad de bienes constituida sobre aquellos tres predios por los cuatro hermanos Quiñones y Quiñones, y al concluirlo así no erró el juez sentenciador. Por ello consideramos correctas las conclusiones de derecho núms, 3, 4 y 5 relativas a la acción de retracto legal.

## III

Finalmente discutiremos las fallas atribuidas a las seis conclusiones jurídicas sobre la contrademanda. Su texto:

"CONTRADEMANDA.

"En su contrademanda, el demandado pretende impugnar la validez del título de dominio que ostenta el demandante José Ramón Quiñones sobre las fincas adquiridas por éste en el año 1941 de su tía Francisca Quiñones Guzmán, alegando el demandado que tanto el testamento mediante el cual doña Francisca heredó esas fincas de su hermano Mariano en el año 1922 como la transacción mediante la cual doña Francisca luego trasmitió esas fincas al demandante en el año 1941 son nulos, alegando el demandado tener derecho a heredar parte de esas fincas como uno de los herederos intestados de ambos causantes.

"1. La acción de nulidad planteada por el demandado en cuanto al testamento de don Mariano Quiñones Guzmán, quien murió en el año 1922, está claramente prescrita. Dicha acción

es una de carácter personal que prescribe a los 15 años, art. 1864 del Código Civil; *Arroyo* v. *Fernández,* 68 D.P.R. 514, habiendo además el demandante José Ramón Quiñones consolidado su derecho dominical sobre las fincas objeto de la contrademanda por prescripción adquisitiva de más de 30 años, ya que de acuerdo con las propias alegaciones del demandado y los hechos probados durante el juicio del caso tanto el demandante José Ramón Quiñones como doña Francisca Quiñones poseyeron esas fincas en concepto de dueños sin interrupción de clase alguna desde el 1922 hasta el presente. Artículos 1859 y 1860 del Código Civil.

"2. Asimismo, la acción de nulidad en cuanto a la transacción mediante la cual el demandante José Ramón Quiñones adquirió estas fincas de su tía Francisca Quiñones Guzmán en el año 1941 tampoco procede, ya que el demandante ha consolidado su dominio sobre estas fincas por la posesión de más de 30 años de él y de su causante, y por haber además el demandante poseído esas fincas desde que las adquirió de su tía en el año 1941 por más de 10 años en concepto de dueño, con justo título y buena fe. Art. 1857 del Código Civil.

"3. En el supuesto de que el demandante no hubiese consolidado su título de dominio sobre estas fincas por prescripción, los motivos de nulidad señalados por el demandado en cuanto a la transacción mediante la cual el demandante adquirió estas fincas de su tía en el año 1941 no están sostenidos por la prueba, siendo los mismos insuficientes para anular el título del demandante.

"La transacción mediante la cual el demandante José Ramón Quiñones adquirió estas fincas de su tía Francisca Quiñones debe considerarse como un contrato de compraventa, y no como una donación, habiendo dicho contrato quedado perfeccionado por los documentos otorgados por ambos contratantes ajustándose a los términos específicos convenidos para la transacción (véase Conclusiones de Hecho #5, 6 y 7), siendo la renta vitalicia convenida como precio de venta una causa lícita y suficiente para dicho contrato. Manresa, *Comentarios al Código Civil,* Ed. 5, vol. 10, p. 8, en el cual afirma dicho tratadista, conviniendo con el criterio de don José Castán y de Scaevola, que la renta o pensión vitalicia se reconoce como precio cierto en un contrato de compraventa.

"Según se desprende de las Conclusiones de Hecho número 13, 14 y 15, la renta vitalicia convenida como consideración

para esta enajenación no resultaba irrisoria o irrazonable, pero aún en el supuesto de que al tiempo de convenirse esta transacción esa renta no guardase proporción con el valor de las fincas y las probabilidades de vida de la vendedora, debe recordarse que, en ausencia de dolo o fraude, de lo cual no hay la más mínima prueba en este caso, el mero hecho de que el precio convenido no parezca compensación justa y suficiente por la cosa vendida no conlleva la nulidad de una compraventa, Castán, *Derecho Civil Español,* ed. 1954, tomo 4, p. 73 y 74; Manresa, *Comentarios al Código Civil,* ed. 5ta. vol. 10, p. 63, 64 y 74, máxime si tenemos en cuenta que en el caso de autos la realidad es que la vendedora disfrutó de esa renta vitalicia por más de doce años, recibiendo ésta un total de alrededor de $60,000.00, siendo esa suma mayor que el precio de $56,200.00 en que valoró la propia vendedora sus fincas al vendérselas al demandante.

"4. En el supuesto de que el demandante no hubiese adquirido un título absoluto de dominio sobre estas fincas por prescripción adquisitiva y que la transacción mediante la cual éste adquirió esas fincas de su tía en el año 1941 deba considerarse como una donación onerosa, también debe sostenerse la validez de esa transmisión de título, ya que la misma se formalizó por la donante y se aceptó por el donatario en escrituras públicas formalizadas respectivamente en Barcelona y Puerto Rico con todos los requisitos exigidos por la ley dentro de cuya jurisdicción se otorgaron los respectivos documentos.

"El documento otorgado en Barcelona ante el Vice-Cónsul de los Estados Unidos debe considerarse como una escritura o documento público, art. 1170 del Código Civil, con el mismo valor de autenticidad que un documento otorgado ante notario, debiendo regirse su otorgamiento, en cuanto a las formalidades del mismo, no por la Ley Notarial de Puerto Rico,(³) sino por las Leyes pertinentes de los Estados Unidos, art. 11 del Código Civil, no habiéndose demostrado por el demandado que el funcionario consular que autorizó el documento hubiese dejado de cumplir con las solemnidades prescritas por las leyes de Estados Unidos para el otorgamiento de ese tipo de documento.

---

"(³) Sólo los documentos otorgados en Puerto Rico *ante notario* están sujetos a las solemnidades establecidas por nuestra Ley Notarial. Art. 1171 del Código Civil."

"Y en cuanto a la alegación del demandado de que la aceptación de la alegada donación no se notificó a la donante en la forma prescrita por el artículo 575 del Código Civil, ese hecho no debe conllevar la nulidad del acto, ya que el pago de la renta vitalicia por el demandante y su aceptación por doña Francisca implica que doña Francisca tuvo pleno conocimiento de la aceptación de la transacción por su sobrino José Ramón Quiñones.

"5. Carece igualmente de méritos el motivo de nulidad aducido por el demandado basado en el hecho de no haberse pagado la contribución de herencia sobre estas fincas cuando las mismas fueron heredadas en el año 1922 por doña Francisca Quiñones de su hermano Mariano Quiñones y cuando ésta las traspasó luego al demandante José Ramón Quiñones en el 1941, esto último en el supuesto de que este traspaso constituya una donación, y no una compraventa.

"La ley vigente a la fecha de la muerte de don Mariano Quiñones en el año 1922 era el artículo 379 del Código Político. Tal disposición legislativa prohibía la 'división o distribución' de los bienes de algún fallecido hasta que no se pagase la contribución de herencia, pero esa disposición no alteró los preceptos de los artículos 603 y 610 del Código Civil, que establecen que los herederos suceden al causante en todos sus derechos *desde el momento de su muerte*' (art. 603), no impidiendo tampoco esa disposición del Código Político que doña Francisca pudiese enajenar o donar los bienes heredados sin haberse aún pagado la contribución de herencia. El propio Código Civil, en su art. 602 expresa con claridad ese criterio, al establecer, luego de haber indicado en los artículos anteriores que mediante el derecho de sucesión el heredero adquiere todos los derechos y obligaciones de su causante, que también adquiere el heredero 'el derecho por el cual puede tomar posesión de los bienes del difunto . . .' El Tribunal Supremo de Puerto Rico ha reconocido este principio en innumerables casos. Así pues, ha resuelto que los herederos tienen derecho, desde el mismo momento de la muerte de su causante, a iniciar acciones de reivindicación sobre bienes de la herencia sin esperar la partición de la herencia, *Irizarry* v. *Bartolomey*, 32 D.P.R. 924, y que los herederos tienen derecho a vender sus participaciones hereditarias desde el mismo momento de la muerte de su causante, sin tener que esperar a que se efectúe la partición de los bienes, *Torres* v. *Registrador*, 75 D.P.R. 128, habiéndose litigado además ante

el Tribunal Supremo de Puerto Rico el montante de la contribución de una herencia en la cual se había aprobado ya la partición de la misma en el año 1920, procediéndose luego a la distribución de los bienes entre los herederos sin que se hubiese todavía pagado la contribución de herencia,(⁴) sin que se hubiese cuestionado en ningún momento ni por los litigantes ni por el propio Tribunal Supremo la validez de esa partición. *Kessler* v. *Domenech, Tesorero,* 49 D.P.R. 196.

"Naturalmente, los herederos siempre responden del pago de esa contribución, *Blanco* v. *Tribunal de Contribuciones,* 72 D.P.R. 855, 862, teniendo éstos además que pagar intereses y recargos cuando se dilata el pago de la contribución, teniendo siempre el Pueblo de Puerto Rico un gravamen preferente sobre los propios bienes que constituyen el caudal hereditario, pudiéndose ejecutar los mismos mediante el procedimiento de apremio establecido por Ley (13 L.P.R.A. 898) en caso de que la contribución no se pague.

"En el caso de autos, doña Francisca Quiñones fue instituida por su hermano Mariano Quiñones como su única y universal heredera en el testamento otorgado por éste el 21 de febrero de 1919 (Exh. E), y tan pronto murió don Mariano en el año 1922, por virtud de las disposiciones de los artículos del Código Civil antes citados, doña Francisca adquirió todos los derechos que tenía su causante sobre estas fincas, pudiendo ésta tomar inmediatamente posesión de las mismas y disponer de ellas libremente a pesar de que la contribución de herencia sobre las mismas todavía no se ha pagado.(⁵)

"6. En la segunda causa de acción expuesta en la contrademanda, el demandado alega que el demandante José Ramón Quiñones ha retenido para sí una porción de terreno de no menos de dos cuerdas de la participación que tenía el demandado en las tres fincas objeto de la acción de retracto, reclamando el demandado el dominio de ese terreno y los frutos percibidos en

---

"(⁴) La contribución vino a pagarse en el año 1932, que fue cuando se le notificó al Tesorero la defunción de la causante."

"(⁵) En cuanto a la transacción mediante la cual doña Francisca cedió esas fincas al demandante José Ramón Quiñones no hay ninguna obligación de pagar contribuciones, ya que hemos concluido que esa transacción fue una venta, y no una donación, siendo además la ley que extiende a las donaciones la contribución de herencia posterior a la fecha en que se formalizó esta transacción."

el mismo desde que se otorgó la escritura de división de comunidad en el 1944 hasta el presente.

"Es cierto que antes de otorgarse esa escritura de división de comunidad el demandado venía disfrutando a plenitud de una participación proindivisa en esas fincas de alrededor de 19 cuerdas, recibiendo parte del arrendamiento de las mismas a base de esa proporción, pero ello no implica necesariamente que al liquidársele la participación del demandado en ese condominio tuviesen los otros comuneros que adjudicarle al demandado exactamente una cuarta parte de la cabida total de las fincas, ya que lo importante es que el *valor* de la parcela de terreno que se le adjudicó al demandado guardase proporción, en una cuarta parte, con el resto de los terrenos que le quedasen a los otros comuneros. Y en el caso de autos, es obvio que esto es así, ya que aunque al demandado se le adjudicó en la división aritmética de la finca un poco menos de la cuarta parte de la cabida total, lo cierto es que ello fue compensado por el hecho de que el demandado sólo recibió terrenos llanos, con un frente a la carretera proporcionalmente mayor que el resto de las fincas (véase Conclusión de Hecho #16) habiéndose quedado José Ramón Quiñones y sus hermanos con los terrenos de monte que apenas tenían valor agrícola alguno.

"Además, el demandado intervino personalmente en la segregación de la parcela de 16.75 cuerdas que se le adjudicó en pago de su condominio y éste en ningún momento mostró inconformidad con esa adjudicación, y en la escritura de división de comunidad el demandado hizo constar, luego de adjudicársele esa parcela 'en pago y adjudicación de su participación en la comunidad . . .', *que cedía a favor de los otros condueños 'todo el derecho, título e interés que tenía y le correspondía como tal condueño' en el remanente de las fincas* (véase Ex. 1). Y debe recordarse además que después de haber adquirido estas fincas José Ramón Quiñones en el 1941, el demandado continuó recibiendo la cuarta parte del producto de estas fincas, a pesar de que a éste sólo le pertenecía la nuda propiedad de esa cuarta parte (véase Conclusiones de Hecho #9 y 10), y en todo caso, ello sería suficiente compensación por cualquier pedazo de terreno que hubiese dejado de recibir el demandado."

El recurrente primeramente argumenta su impugnación a la Núm. 3 de las conclusiones que anteceden. Sostiene que

"el tribunal resolvió erróneamente . . . que el traspaso de doña Paca Quiñones Guzmán es un contrato de compraventa, cuando dicho traspaso constituyó una donación onerosa inter vivos."

Muy interesante es su extensa exposición de la jurisprudencia y la doctrina científica en torno al concepto de donación y sobre las múltiples maneras en que la misma puede presentarse disfrazada o en forma indirecta. Pero no nos ha convencido de que el contrato en cuya virtud la señora Quiñones Guzmán trasmitió a José Ramón Quiñones los bienes y derechos descritos en la contrademanda, no es uno de compraventa en que la renta vitalicia ocupó el lugar del precio, sino uno de donación onerosa inter vivos, y que, en el supuesto de que ésta fue el contrato que ellos se propusieron celebrar, tal donación sea nula e inexistente y sin eficacia jurídica alguna entre las partes y sus causahabientes para transferir el dominio pleno de los mismos al comprador.

El contrato específico aquí envuelto, aunque doctrinal o prácticamente guarde afinidad con la donación onerosa *inter vivos*, no puede considerarse como donación alguna. No hubo prueba de que las partes lo trataran como donación. (19)

_____

(19) Omitiéndose la descripción de las fincas y derechos objeto del contrato y la constancia o certificación de su otorgamiento librada por el vicecónsul que está unida al documento, el texto de éste es el siguiente:

"Número — En la ciudad de Barcelona, España, "a los tres días del mes de setiembre de mil novecientos cuarentiuno. ANTE MI: Licenciado, Digo, Mr. Temple Wanamaker, Jr., Vice-Cónsul de los Estados Unidos de América en esta Ciudad, COMPARECE: De una sola parte: Doña María de los Dolores Quiñones y Guzmán, conocida familiarmente por Francisca o Paca Quiñones, ciudadana de los Estados Unidos de América, quien es mayor de edad, soltera, propietaria y vecina de esta ciudad.—Conozco a la compareciente y a mi juicio tiene la capacidad legal necesaria para este otorgamiento, dando fe de su edad, estado, profesión y vecindad por sus dichos; y en tal virtud la citada compareciente expone: PRIMERO: Que doña María de los Dolores Quiñones Guzmán, conocida también por Francisca o Paca Quiñones, es dueña en pleno dominio de las fincas que se describen a continuación, adquiridas por título de herencia, y todas radicadas en el Municipio de San Germán, isla de Puerto Rico: [descripción de once fincas.] SEGUNDO: Que asimismo dicha doña María de los Dolores Quiñones y Guzmán conocida por Francisca o Paca Quiñones

Las expresiones del contrato son simples, claras; no hay en ellas ambigüedad alguna; no se prestan a posibles dudas respecto a la intención de la otorgante y a la naturaleza del contrato de venta. En tal caso debe estarse al sentido literal de sus cláusulas. En donde dice—genuina declaración de la voluntad de la vendedora—"Que ha convenido vender y por la presente vende a su sobrino José Ramón Quiñones y Quiñones . . .", no puede imaginarse que dice "Que ha convenido donar y por la presente dona a su sobrino José Ramón Quiñones y Quiñones . . . ."

La conducta posterior de vendedora y comprador, pagando éste y aquélla recibiendo, mes por mes, desde setiembre de 1941 hasta el 12 de enero de 1954, en que ella fallece, la pensión de $400.00 mensual, y que fue calculada como "una

es dueña en propiedad en pleno dominio por herencia de un condominio indiviso por dos cuartas partes de la finca que a continuación se describe, teniendo además el usufructo de las otras dos cuartas partes propiedad de los herederos de sus hermanos don Tomás Ramón Canturriense y don Rosendo Quiñones y Guzmán, siendo dicha finca la siguiente: [Se describen las tres parcelas objeto del retracto.] TERCERO: Que ha convenido vender y por la presente vende a su sobrino don José Ramón Quiñones y Quiñones, mayor de edad, soltero, Presidente de la Comisión de Servicio Público de Puerto Rico, y vecino de San Juan, Isla de Puerto Rico, Estados Unidos de América, cuantos derechos y acciones le correspondan en las fincas arriba descritas, traspasándole desde hoy, todo título e interés que la vendedora tiene en las mismas; en consideración a que el señor Quiñones ha de obligarse a entregar a la otorgante una renta de cuatrocientos dólares (moneda de los Estados Unidos de América) mensuales durante la vida de ésta.—CUARTO: El señor Quiñones se obliga a aceptar este contrato en el término de seis meses a contar de hoy, retrotrayéndose los efectos de dicha aceptación a los del presente otorgamiento. Siendo condición de este contrato que todas y cada una de las fincas descritas quedan sujetas a la obligación de renta vitalicia durante la vida de la señorita Quiñones. (Firmado) María F. D. y Quiñones."

En la escritura pública otorgada por José Ramón Quiñones el 20 de octubre de 1941, éste aceptó y ratificó ese contrato haciendo "constar solemnemente que acepta en todas sus partes y condiciones la escritura arriba transcrita con todas sus condiciones y obligaciones; obligándose a entregar a la vendedora señorita Quiñones una renta de CUATROCIENTOS DOLARES ($400.00) mensuales durante la vida de ésta a contarse desde el tres de setiembre del corriente año mil novecientos cuarenta y uno".

suma total de alrededor de $60,000.00", aleja toda idea de que se trata de "una donación onerosa inter vivos disfrazada", aun cuando resultara la pensión menor que la renta normal de los bienes, porque toda la obligación que el Código Civil—Art. 1334—impone al comprador es de pagar por la cosa determinada vendida "un precio cierto, en dinero o signo que lo represente".

Como apunta Manresa—tomo 10, pág. 63, Ed. 5ta., "Para concluir lo referente a la verdad del precio, diremos con Pacifici Mazzoni (1): es cierto que el precio es el equivalente económico de la cosa, pero entiéndase bien que para tener por constituida esa equivalencia no se requiere que el precio represente exactamente el valor en venta de la cosa vendida sino que basta que el precio mismo implique para el vendedor alguna utilidad apreciable que venga a sustituir a la que antes derivaba de la cosa."

No creemos que la acción impugnativa contra esa venta instada en la contrademanda por Rosendo Quiñones deba prosperar. Tratándose de un contrato de compraventa, en cuya celebración quedaron sustancialmente cumplidos los requisitos esenciales de ley y consumado definitivamente al cesar el pago de la pensión con la muerte de la vendedora en enero de 1954, Rosendo Quiñones Irizarry y demás herederos de ésta quedaron obligados a respetarlo cualquiera que hubiera sido la forma en que se hubiera celebrado. Arts. 1206, 1208, 1209, 1210 y 1230, Código Civil. La escritura defectuosa, por incompetencia del notario o por falta en la forma, tendrá el concepto de documento privado, si estuviese firmada por los otorgantes, y el documento privado, reconocido legalmente, tendrá el mismo valor que la escritura pública entre los que lo hubiesen suscrito y sus causahabientes. Arts. 1177 y 1179, Código Civil. Nadie negó que doña Francisca firmara el documento otorgado en Barcelona.

Aceptó la existencia, validez y eficacia de ese contrato al otorgar la escritura de división de comunidad en 21 de enero

290

de 1944. (Véase su párrafo tercero en la anterior página 63.)

Bajo la hipótesis de que el contrato hubiera estado viciado de nulidad, la acción para anularlo había prescrito el 20 de octubre de 1945, contado el término de cuatro años fijado por el Art. 1253, desde el 20 de octubre de 1941, fecha en que el comprador aceptó el contrato. Le hubiera correspondido a la vendedora ejercitarla, puesto que la muerte de ella ocurrió en 1954.

■ Por su posesión física dominical, con justo título, —aunque no hubiera sido perfecto—quieta, pública y pacífica, de buena fe y sin interrupción de clase alguna, [20] mantenida por más de 13 años—contados desde el 20 de octubre de 1941, en que acepta la venta hasta el 21 de marzo de 1955 en que por primera vez Rosendo alega esa nulidad —José Ramón Quiñones, por prescripción dominical ordinaria, había obtenido la consolidación de su pleno derecho de propiedad sobre esos bienes y derechos. Art. 1857, Código Civil.

Si el contrato celebrado en virtud de las mencionadas escrituras del 3 de setiembre de 1941 y del 20 de octubre de 1941, fue en verdad uno de donación onerosa inter vivos, la inmediata entrada en la posesión física del supuesto donatario José Ramón Quiñones en esos bienes y derechos donados, su religioso cumplimiento en el pago mensual de la renta vitalicia hasta la muerte de la alegada donante, y la posesión

---

[20] El propio contrademandante, en el párrafo 7 de su contrademanda, primera causa de acción de nulidad, expuso:

"7.—Que el demandante y contrademandado José Ramón Quiñones ha estado en la posesión y disfrute y ha explotado para su único y exclusivo beneficio los bienes alegadamente adquiridos de la causante doña María de los Dolores Quiñones y Guzmán conocida por doña Francisca y doña Paca Quiñones Guzmán, percibiendo los frutos de dichos bienes para su propio y exclusivo beneficio, y que el referido demandante y contrademandado ha dejado de satisfacer al demandado y contrademandante su participación en los frutos y beneficios de dichas propiedades que asciende a una cantidad no menor de VEINTE MIL DOLARES ($20,000.00)."

material al amparo del título escrito de donación, pública, pacífica, de buena fe y sin interrupción desde el 20 de octubre de 1941 hasta el 21 de marzo de 1955, era suficiente en derecho para haber adquirido por prescripción ordinaria, un título perfecto de pleno dominio sobre los bienes donados. Lo que pudieron haber dejado de hacer donante y donatario respecto al otorgamiento de un título perfecto de donación, asumiendo que tal cosa quisieron hacer, lo hizo por ellos la prescripción ordinaria, que se encargó de curar, convalidar y subsanar todos los defectos, vicios, faltas, fallas, imperfecciones y deficiencias de tal título de donación.

Si a ese período de 13 años se une el tiempo de posesión de sus causantes en derecho—47 años, contados desde el 1894 hasta el 1941, de continuada posesión por sus tíos doña Francisca y don Mariano Quiñones Guzmán—conforme a los Arts. 1859 y 1860 de ese código, haciendo un total mayor de 60 años de posesión física constante, José Ramón Quiñones ya había adquirido por prescripción extraordinaria un título de dominio perfecto e independiente. Ello hace innecesario proceder a discutir otros motivos de nulidad de la supuesta donación planteados en el alegato del recurrente. ([21])

---

([21]) Por resolución de 3 de junio de 1954, dictada por el Tribunal Superior, Sala de San Juan, fueron declarados únicos y universales herederos abintestato de la vendedora doña Francisca Quiñones Guzmán los ocho sobrinos que la sobrevivieron y que se llaman Sara María, Antonia, José Ramón y Segismundo Quiñones y Quiñones; Norberto Alfredo y Rosendo Quiñones Irizarry; Fernando Quiñones Rosado y Carlos Manuel Dámaso Quiñones Lugo.

Estando en trámite la acción de retracto legal, pero sin que aún se hubiera presentado la contestación y contrademanda, el coheredero Carlos Manuel Dámaso Quiñones Lugo inició como única parte demandante, el 10 de enero de 1955, ante la misma Sala de Mayagüez del Tribunal Superior, contra José Ramón Quiñones y Quiñones, una acción para que se declarasen "nulas eneficases [sic] la escritura de fecha 3 de setiembre de 1941 otorgada por doña María de los Dolores Quiñones y Guzmán conocida por Francisca o Paca ante el Vice Cónsul de los Estados Unidos de América en la ciudad de Barcelona, España, Mr. Temple Wanamaker, así como la escritura de aceptación y ratificación número 145 de fecha 20 de octubre de 1941 ante el notario Oscar Souffront de Mayagüez, Puerto Rico." En esa demanda se insertó íntegramente el texto de la escritura de

Tratándose en efecto de un contrato de compraventa,— no de donación onerosa inter vivos—en el que la renta vitalicia hizo el papel de precio, estimamos innecesario considerar

aceptación y ratificación otorgada por José Ramón Quiñones el 20 de octubre de 1941, ante el notario Oscar Souffront, en que aparece transcrito el documento de venta con precio de renta vitalicia suscrito ante el vicecónsul por doña Francisca el 3 de setiembre de 1941, posteriormente impugnado por Rosendo en el pleito de retracto. Los fundamentos de nulidad allí alegados fueron:

"(A) Porque el referido documento no se otorgó de acuerdo con los requisitos y con las leyes legales que rigen el notariado en Puerto Rico al no verificarse en un solo acto y observarse los demás requisitos que dispone la Ley.

"(B) Porque el Vice-Cónsul Mr. Temple Wanamaker, Jr. no tiene autorización legal para otorgar una escritura de esa naturaleza.

"(C) Porque no existió causa en dicho contrato ya que la cantidad de CUATROCIENTOS DOLARES mensuales que se estableció como la condición del contrato representa solamente una fracción pequeña del producto de dichas propiedades que están en poder del demandado José Ramón Quiñones como administrador."

Contra esa demanda, José Ramón Quiñones formuló una moción de desestimación por insuficiencia. Discutida y sometida la misma para su decisión el distinguido magistrado que entonces presidía esa Sala, Ángel Fiol Negrón, dictó el 31 de marzo de 1955, una resolución que, en la parte pertinente, es como sigue:

"(1) Según el artículo 1213 del Código Civil, ed. 1930, todo contrato es válido cuando concurren los tres requisitos de a) consentimiento de los contratantes, b) objeto cierto que sea materia del contrato y c) causa o consideración de la obligación que se establezca. Según el artículo 1214, el consentimiento se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato. Nada dice el código y nada encontramos en la jurisprudencia al efecto de que el consentimiento de las partes o sea el concurso de la oferta y de la aceptación de la cosa y la causa que deba consignarse en un solo acto o documento. Por el contrario, el propio artículo 1214 contempla la posibilidad de una aceptación posterior y aún en distinto sitio al disponer que la aceptación hecha por carta no obliga al que hizo la oferta sino desde que llegó a su conocimiento.

"Es cierto, como alega el demandante, que los actos y contratos que tengan por objeto la transmisión de derechos reales sobre bienes inmuebles deberán constar en documento público, Artículo 1232, Código Civil, ed. 1930. Ello no quiere decir, sin embargo, que la transmisión deba quedar completa y consumada en un solo documento público y la aceptación puede constar en otro documento público distinto y separado.

"(2) La disposición contenida en el artículo 1232 del Código Civil, ed. 1930, al efecto de que los actos y contratos relacionados con derechos reales sobre bienes inmuebles en Puerto Rico deban consignarse en escri-

el error que el recurrente atribuye a la conclusión de derecho Núm. 4, sobre la contrademanda, en que se determinó que si el traspaso se hubiera considerado como una donación one-

---

tura pública, es únicamente aplicable a los actos y contratos efectuados en Puerto Rico ya que el propio Código dispone en su artículo 11 que 'las formas y solemnidades de los contratos, testamentos e instrumentos públicos, se rigen por las leyes del país en que se otorguen' y que 'cuando los actos referidos sean autorizados por funcionarios diplomáticos o consulares de los Estados Unidos en el extranjero se observarán en su otorgamiento las solemnidades establecidas por las leyes de los Estados Unidos.' Tales formas y solemnidades incluyen la autoridad del funcionario ante quien se otorga el acto o contrato y las formalidades y solemnidades del acto o contrato en sí. Encontramos, en cuanto a lo primero que el agente consular de los Estados Unidos en Barcelona, España, ante quien se otorgó el documento de 3 de septiembre de 1941, es un funcionario autorizado por las leyes de los Estados Unidos, entre otras cosas, para autorizar u otorgar dentro de su consulado cualquier acto notarial que cualquier notario público esté autorizado por ley a autorizar u otorgar dentro de los Estados Unidos. 22 USCA, Sec. 98, pág. 47. En cuanto a lo segundo, en ausencia de alegación en contrario en la demanda, debemos asumir, inferir y concluir que el agente consular guardó y observó en el referido acto las solemnidades establecidas por las leyes de los Estados Unidos. Artículo 464(32) código de Enjuiciamiento Civil, ed. 1933. Por otro lado, aún en el caso de considerarse el referido documento como uno privado, éste tiene el mismo valor y efecto que la escritura pública para el demandante, heredero y causahabiente de la otorgante. Artículo 1179, Código Civil, ed. 1930.

"(3) De la propia demanda surge que hubo suficiente causa o consideración en el contrato de traspaso efectuado entre la causante y el demandado. No es raro ni extraño que una persona trasmita propiedades que no puede o no desea atender personalmente a otra asegurándose de una renta fija a cambio del traspaso. Tal es el caso de la donación onerosa que contempla el artículo 560(2) del Código Civil, ed. 1930, y más específicamente el contrato de censo reservativo descrito en el artículo 1499 de dicho Código.

"La pensión de $400.00 mensuales o sea de $4,800 anuales no es una inadecuada ni irrisoria considerando el valor de $56,200.00 dada a las propiedades trasmitidas por la propia causante. No debe perderse de vista que ésta, sin herederos forzosos podía disponer libremente de sus bienes y nada se alega en la demanda al efecto de que en la trasmisión específica al demandado mediare fraude, dolo o indebida influencia. En la demanda se alega por otro lado, que la causante dejó otros bienes sujetos a partición.

"(4) De lo antes expuesto, debe confluirse que la demanda no aduce hechos suficientes de causa de acción y no siendo la misma susceptible de enmienda debe ser desestimada la acción entablada.

rosa en su constitución también se cumplieron y observaron todos los requisitos y solemnidades de ley.

Lo mismo ocurre respecto a la impugnación de las conclusiones núms. 1 y 2, sobre la primera causa de acción de la contrademanda, que estimó adquirido el dominio por la pres-

---

"Se dictará y el Secretario registrará sentencia con arreglo al apartado 4 *ante* con las costas a cargo del demandante, sin honorarios de abogado."

De la sentencia se apeló ante nos, señalándose el recurso bajo el Núm. 11,652 en la secretaría de este Tribunal Supremo. El 20 de setiembre de 1956 dictamos en el recurso sentencia confirmando, sin opinión, el fallo apelado.

La demanda de nulidad se interpuso por Carlos Manuel Dámaso Quiñones (hijo de Carlos Eladio Quiñones Guzmán, hermano de doña Francisca) como heredero abintestato de doña Francisca Quiñones Guzmán. En primer término, en ella se alega el hecho del fallecimiento de doña Francisca y el haberse dictado la mencionada resolución declarando herederos únicos y universales suyos a sus ocho sobrinos antes mencionados, entre ellos el allí demandante y Rosendo Quiñones Irizarry, y que "además de los bienes que existen en proceso de partición, la causante dejó además otros bienes consistentes en varias fincas rústicas dedicadas al cultivo de cañas que pertenecen a los miembros de su sucesión y que están en poder del demandado José Ramón Quiñones Quiñones."

Rosendo presentó en marzo de 1955 su contrademanda en el retracto, dos meses después de iniciada la anterior demanda por su coheredero Carlos Manuel Dámaso Quiñones. Los tres fundamentos de nulidad alegados por éste se repiten por Rosendo en la acción de nulidad de los mismos documentos (venta y aceptación de venta) que ejercita en la contrademanda. El fundamento (A) en la demanda de aquél se denomina (a) en la contrademanda de éste; el (B) se denomina (b) y el (E) se denomina (e). Comparados cuidadosamente los tres fundamentos de aquella demanda, fueron vaciados esencialmente en los primeros 10 fundamentos de nulidad de la contrademanda. El fundamento (K) nulidad por no haberse satisfecho primeramente la contribución de herencia en la sucesión de Mariano Quiñones Guzmán, que se aduce en la contrademanda, no se expuso en aquella demanda de Carlos Manuel. Si bien Rosendo no figuraba como parte en aquel litigio, estaba unido al demandante por vínculos de solidaridad.

Durante el juicio ante el tribunal de instancia el récord original de ese pleito fue ofrecido en evidencia por los demandantes recurridos. A ello se opuso el demandado por no haber sido parte en el pleito. Definitivamente no fue ni rechazado ni admitido en evidencia. El tribunal a quo dijo: "La Corte lo considerará al resolver este caso y, dentro de las cosas que resolverá en este caso, resolverá si ese fallo tiene alguna aplicación con este litigio."—Ver págs. 102 a 106, Tr. Pieza 1.—Nada, en especial, resolvió el tribunal de origen respecto a esta cuestión en su fallo.

cripción ordinaria de 10 años y, además, por la extraordinaria de 30 años. El recurrente bajo la falsa premisa de que el contrato fue una donación y no de compraventa, premisa que es el sostén jurídico de la mayor parte de sus planteamientos en revisión, sostiene que esa donación es inexistente, por no haberse cumplido en su constitución los requisitos legales y las solemnidades propias de toda donación, y que, consecuentemente, la continuada posesión física de esos bienes por José Ramón Quiñones, durante más de 10 años, fue una posesion vicaria, en representación de la dueña, nunca su personalísima posesión dominical.

■ Finalmente, el recurrente señala como errónea la conclusión de derecho Núm. 5, sobre la contrademanda, en la que se determinó que el contrato de venta en sí no era nulo por no haberse satisfecho la contribución de herencia que correspondía pagar a la vendedora como única heredera de su hermano Francisco Mariano Quiñones Guzmán.

En las páginas 270 y 271 que anteceden expusimos que una fracción del condominio que Francisca Quiñones Guzmán vendió en 1941 a José Ramón Quiñones, la había adquirido por herencia testada de su hermano Francisco Mariano al fallecer éste en mayo de 1922. A la fecha de perfeccionarse la venta, 20 de octubre de 1941, la contribución sobre la herencia dejada por ese causante no había sido satisfecha.

La existencia de esa obligación contributiva a cumplirse por la heredera vendedora, cuyo origen se remonta a mayo de 1922, ¿produjo una energía impediente tan poderosa en derecho que imposibilitaba o prohibía en absoluto y bajo pena de plena nulidad, el nacimiento, perfección, existencia, validez, eficacia, obligatoriedad y cumplimiento del contrato de venta en sí (respecto a la fracción de los bienes, derechos y acciones trasmitidos que ella había heredado 20 años atrás de su hermano), entre las partes contratantes y sus causahabientes, como parece sostener el recurrente? A juicio nuestro, no.

El precepto de ley aplicable en la fecha de la perfección del contrato—20 de octubre de 1941—es el siguiente Art. 12 de la Ley Núm. 99 de 1925, según quedó enmendado por la Ley Núm. 20, aprobada el 27 de abril de 1933.

"Artículo 12.—Excepto en los casos especiales, según se determina en el artículo 5a de esta Ley, ningún tribunal aprobará la división o distribución de los bienes de ningún fallecido, ni permitirá la liquidación final de las cuentas de ningún albacea, administrador, fideicomisario o persona que administre cualesquiera bienes, a menos de haberse presentado y exhiban el recibo o los recibos especiales, según lo dispuesto en el artículo 11 de esta Ley; y ningún notario expedirá, autorizará o certificará instrumento alguno de sentencia, división, o distribución, enajenación o hipoteca de bienes, a menos de haberse presentado dicho recibo o recibos, expedidos por el Tesorero; y ningún registrador inscribirá en ningún registro a su cargo, instrumento alguno ni fallo, sentencia o auto judicial autorizado, dictado o emitido en relación con la división, distribución o entrega de dichos bienes, a menos de haberse presentado el recibo o recibos expedidos por el Tesorero; y las personas que infrinjan las prescripciones de este artículo serán responsables por todas las contribuciones no satisfechas, a causa de dicha infracción pagando además el interés, según se dispone en el artículo 9 de esta Ley, e incurrirán en un delito menos grave que se castigará con multa que no será menos de cien (100) a mil (1,000) dólares o cárcel por tres meses a un año, o ambas penas a discreción del tribunal."

Se disponía por el Art. 9 de la citada Ley Núm. 99, tal como también había quedado enmendado por la Núm. 20 de 1933:

"Artículo 9.—Todas las contribuciones impuestas por virtud del artículo 2 de esta Ley serán ingresadas en la Tesorería de Puerto Rico, por los administradores, albaceas, fideicomisarios u otras personas que administraren los bienes sujetos al pago de dichas contribuciones; y todos los referidos administradores, albaceas, fideicomisarios o personas serán responsables por dichas contribuciones, con intereses como más adelante se prescribe, hasta que las mismas hayan sido satisfechas. Dichas contribuciones serán devengadas y pagaderas dentro del término

de ciento ochenta días después del fallecimiento del causante, y constituirán, desde luego, un gravamen preferente sobre todos los bienes del causante y seguirán siendo gravamen hasta que se satisfagan por entero. Si dichas contribuciones no se pagasen dentro del expresado término de ciento ochenta días, se cargarán y cobrarán intereses sobre ellas al tipo de 1 por ciento por cada mes o fracción de mes y el colector u otro agente debidamente autorizado por el Tesorero, procederá, después de obtenido el consentimiento escrito del Tesorero, al cobro de las mismas mediante embargo y venta de la propiedad del causante, del mismo modo y mediante el mismo procedimiento de apremio establecido por la ley actual para el cobro de contribuciones sobre la propiedad."

En nuestro Derecho Civil, el contrato existe desde que una o varias personas, con plena capacidad para obrar, consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio; produce efecto entre las partes que lo otorgan y sus herederos; en términos generales, se perfecciona por el mero consentimiento, y desde entonces obliga, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza, sean conformes a la buena fe, al uso y a la ley; en particular, el de compraventa se perfecciona entre comprador y vendedor, y será obligatorio para ambos, si hubieren convenido en la cosa objeto del contrato, y en el precio, aunque ni la una ni el otro se hayan entregado. (22)

Nada encontramos en el transcrito Art. 12 que para entonces prohibiera a un heredero vender o enajenar los bienes, derechos y acciones que como tal heredero hubiera adquirido, y desde el momento de la muerte de su causante, por la falta en el pago de la contribución sobre herencia que le correspondiera satisfacer. No les salía al paso de las transacciones o negocios sobre bienes hereditarios, mientras los mismos se realizaran y mantuvieran estrictamente en el ámbito privado de las partes y de sus herederos. Pero cuando

(22) Arts. 1206, 1209, 1210, 1339, Código Civil.

esas partes deseaban revestir sus actos o contratos con la fe pública notarial, o que recibieran la necesaria sanción judicial o que gozaran de la garantía pública registral contra terceros, entonces, como indispensable requisito previo, el heredero contratante tenía que haberse provisto del "recibo o recibos expedidos por el Tesorero", acreditando el pago de la contribución sobre herencia que le hubiera correspondido satisfacer.

Para asegurar el cobro o pago del tributo, privaba el Estado acreedor por ese Art. 12 a los sucesores de servicios notariales, judiciales y registrales, impidiendo con ello que desapareciera el capital relicto en el torrente circulatorio de los negocios y en el tráfico de bienes, hasta que se cumpliera la obligación contributiva originada por la sucesión hereditaria. Para los fines especificados en esa disposición legal—aprobar la división o distribución de los bienes de persona fallecida, permitir la liquidación final de las cuentas del albacea, administrador, fideicomisario o persona que administre cualesquiera bienes, respecto a los tribunales; expedir, autorizar o certificar instrumento alguno de sentencia, división o distribución o enajenación de bienes, respecto a los notarios, e inscribir instrumento alguno ni fallo, sentencia o auto judicial autorizado, dictado o emitido en relación con la división, distribución o entrega de dichos bienes, respecto a los Registradores de la Propiedad "a menos de haberse presentado el recibo o recibos expedidos por el Tesorero . . ."— quedaban absolutamente interdictadas o vedadas la jurisdicción, competencia y funciones de notarios, jueces y registradores de la propiedad y por todo el tiempo en que estuvieran sin expedirse tal recibo o recibos. El notario, juez o registrador que actuara en contrario a esas prescripciones sería responsable "por todas las contribuciones no satisfechas a causa de dicha infracción pagando además el interés", e incurría "en un delito menos grave que se castigaría con multas de cien a mil dólares o cárcel por tres meses a un año, o ambas penas a discreción del tribunal.

Por otro lado el transcrito Art. 9 (1) hacía a "los administradores, albaceas, fideicomisarios o personas que administraran esos bienes, responsables por dichas contribuciones, con intereses . . . hasta que las mismas hayan sido satisfechas"; (2) disponía que esas contribuciones constituirían "desde luego, un gravamen preferente sobre todos los bienes del causante y seguirán siendo gravamen hasta que se satisfagan por entero", y, (3) autorizaba, bajo ciertas condiciones, su cobro "mediante embargo y venta de la propiedad del causante . . . mediante el mismo procedimiento de apremio establecido . . . para el cobro de contribuciones sobre la propiedad."

Sin embargo, ninguno de dichos artículos prohibía los negocios privados entre partes, sobre esos bienes. La escritura pública de enajenación o disposición de bienes heredados, hecha en violación de esa disposición, podría perder su calidad de auténtica y su fuerza probatoria como tal, pero si está firmada por los otorgantes valdrá entre las partes en concepto de documento privado, sin que se afecte la existencia y eficacia en sí del acto jurídico en ella consignado. Lo que sólo queda efectado es la forma solemne que se le haya procurado dar.

Mientras no eran necesarios para el nacimiento, validez y eficacia de las obligaciones y contratos privados entre las partes obligadas o contratantes, o mientras no se requirieran los servicios notariales, la intervención judicial, o la protección pública registral, no entraban en juego las prohibiciones dispuestas por dicho Art. 12.([22a])

En *Álvarez* v. *Manzano*, 66 D.P.R. 361, 369 (1946), así lo sostuvimos. Ése fue un pleito sobre cumplimiento de contrato privado de transacción sobre bienes y derechos hereditarios, celebrado por Emilio Álvarez y los herederos de su finada esposa el 30 de junio de 1944. Por el contrato privado éstos se comprometieron a vender a Álvarez y éste se obligó a

---

(22a) Véase *Ruiz* v. *Ruiz*, 74 D.P.R. 347 (1953).

comprar, las participaciones que les correspondía "en los bienes dejados por la finada doña Aurelia Manzano." Se fijaron los precios respectivos de los bienes. Se acordó que la escritura formal sería otorgada en una fecha futura ya que era necesario previamente determinar el monto de ciertas deudas. Surgieron después divergencias entre los contratantes en la interpretación del contrato y no llegó a consumarse voluntariamente la transacción, por lo que Álvarez instó acción para su cumplimiento específico. El tribunal de instancia emitió fallo dando lugar a la demanda. Ordenó que previo el depósito en la secretaría del tribunal por el demandante de la suma de $9,532.70 se otorgara por los demandados "la correspondiente escritura de traspaso de la finca . . . descrita en la demanda, a favor del demandante . . . y en caso de que no lo efectúen los demandados, que se proceda por el Márshal de esta Corte a otorgar la correspondiente escritura de traspaso . . . ."

Sostuvieron en apelación los demandados que "la corte inferior actuó sin jurisdicción en este caso al aprobar la división de bienes de la herencia de Aurelia Manzano sin exigir el correspondiente recibo acreditativo del pago de la contribución de herencia". Resolvimos ese planteamiento así:

"El contrato quedó perfeccionado en Arecibo el 30 de junio de 1944, cuando las dos partes, vendedores y comprador, llegaron a un acuerdo respecto al precio y a la cosa. Lo que las partes pospusieron para llevar a cabo en Ciales fue la consumación del contrato, y no pudiéndose verificar la consumación entonces, la exigió el demandante a través de este pleito de cumplimiento de contrato.

"[4] Arguyen los demandados que erró la corte inferior al declarar con lugar la demanda porque el referido documento no fue aprobado por la corte. Sostienen que era necesaria esa aprobación por hallarse los bienes sujetos a una administración judicial.

"Tal aprobación no era necesaria, pues todas las personas interesadas en la herencia, es decir, el demandante y los demandados, son mayores de edad. Véase por analogía el art. 604 del

Código de Enjuiciamiento Civil. Una vez puestas de acuerdo las partes, o firme ya la sentencia decretando el cumplimiento del contrato y otorgada la correspondiente escritura, bastaría solicitar de la corte que diese por terminada la administración judicial y ordenase al administrador que hiciese entrega de los bienes al comprador.

"[5] Sostienen los demandados que la corte inferior actuó sin jurisdicción en este caso al aprobar la división de bienes de la herencia de Aurelia Manzano sin exigir el correspondiente recibo acreditativo del pago de la contribución de herencia.

"Esta contención de los demandados está predicada en lo dispuesto en la sección 12 de la Ley núm. 99 aprobada el 29 de agosto de 1925 (Leyes de 1925, pág. 791), según fue enmendada por la Ley núm. 20, aprobada el 27 de abril de 1933 (Leyes de 1932–33, pág. 233).

"Sin duda que, a través del contrato cuyo cumplimiento decretó la corte, se llevó a cabo la división de la herencia de Aurelia Manzano. Pero siendo todos los herederos mayores de edad, la división de la herencia no necesitaba la aprobación judicial, de conformidad con el art. 604 del Código de Enjuiciamiento Civil. Por consiguiente, la sección 12 no privó de jurisdicción a la corte para dictar la sentencia en este caso. No es que las partes en este caso puedan burlar lo prescrito en la citada sección 12, pues al proceder al otorgamiento de la escritura, que de acuerdo con la sentencia tenía que otorgarse, el notario, en cumplimiento de la citada sección 12, no autorizaría la referida escritura, a menos que se le presentase el recibo del pago de la contribución de herencia. El Registrador, a su vez, de acuerdo con la misma sección 12, no inscribiría la escritura sin que también se le acreditase el pago de la contribución de herencia."

Confirmamos la sentencia apelada que reconoció validez y eficacia, entre las partes, al contrato transaccional suscrito por ellas y que obligó a los herederos a cumplirlo no obstante no haberse pagado la contribución de herencia.([23])

---

([23]) En *Caballero* v. *Kogan*, 73 D.P.R. 666, 677 (1952), reiteramos lo que en el de *Álvarez* v. *Manzano* resolvimos sobre el perfeccionamiento, validez y eficacia del contrato privado suscrito entre las partes. Realmente se trata de un defecto serio en la forma solemne que se le ha dado al contrato, que impide surtir efectos legales como documento auténtico mien-

El recurrente, al final de su alegato (págs. 112 y 113), expresa, como última impugnación, que el tribunal de instancia erró al denegar la admisión de prueba documental y prueba pericial ofrecida para establecer el valor real de los bienes objeto de la "donación" y erróneamente admitió prueba testifical y documental inmaterial, impertinente o por otras razones inadmisible. No argumenta este señalamiento. Solamente a continuación del mismo dice:

"No consideramos necesario adicionar a los fundamentos de error que se han discutido extensamente en este alegato, el señalamiento contenido bajo el número 9."

Después de lo que hemos expresado en el cuerpo de esta opinión y en vista de lo que dispone la Regla 50 de las de Procedimiento Civil, no hay motivo para una consideración ulterior de los fundamentos en que ese señalamiento pueda descansar.

No se cometieron, pues, ninguno de los errores señalados por el recurrente, *procediendo la confirmación de la sentencia recurrida con sujeción a las siguientes modificaciones:*

*A. La adquisición por subrogación a efectuarse respecto a los condominios retraídos, conforme al párrafo segundo del Art. 1412 del Código Civil, se hará a prorrata de la porción que cada demandante retrayente, respectivamente, tenga en la cosa común, ya que tales porciones no son iguales;*

---

tras esté sin satisfacer el impuesto hereditario. Tan pronto se paga totalmente la contribución, el documento recobra su autenticidad. El notario no debe en forma alguna autorizar documentos de esa índole porque está sujeto a las consecuencias penales de su acto ilegal. Pero tratándose de una de las medidas para la seguridad del cobro de un crédito contributivo, no debe tener la falta del pago consecuencias jurídicas tan desastrosas para la libre contratación como la de impedir recobrar el documento, o adquirir por primera vez, la autenticidad perdida o la que no había alcanzado con motivo de la infracción del estatuto, y mucho menos, la de producir la inexistencia absoluta del propio acto o contrato objeto del documento. Podríamos decir que hasta que se pague la contribución la autenticidad de la escritura pública está bajo condición suspensiva.—Véase *Mercedes Bus Line* v. *Rojas*, 70 D.P.R. 540, 543 (1949).

*B. La finca de mayor cabida, descrita en la demanda de retracto bajo la letra "A", de la cual se hizo la segregación de la parcela de 16.75, debe describirse del mismo modo en que se describe en el párrafo SEXTO de la escritura de división de comunidad, Núm. 6, otorgada el 21 de enero de 1944, ante el notario Oscar Souffront, o sea, con sus nuevos linderos y cabida actual de 49.75 cuerdas;*

*C. Los demandantes quedan obligados a no vender los condominios, derechos y acciones retraídos durante un plazo de cuatro años a contarse desde la fecha en que se les otorgue la escritura pública de trasmisión de esos condominios, derechos y acciones, y así, en su día, deberá hacerse constar en el Registro de la Propiedad.*